# EXHIBIT

# 2

# PART I

DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION TO COMPEL ANSWERS
TO INTERROGATORIES, RESPONSES TO
REQUESTS FOR PRODUCTION AND TO
COMPEL SUBMISSION TO R.34 INSPECTION

1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF ILLINOIS

3

4    DISABLED PATRIOTS

5    OF AMERICA, INC.,

6    A FLORIDA CORPORATION,

7    BONNIE KRAMER, INDIVIDUALLY,

8              Plaintiffs,

9       vs.                        Case No. 1:07CV06362

10   TOWN & COUNTRY

11   CHICAGO ASSOCIATES, LLC,

12   A FOREIGN LIMITED

13   LIABILITY COMPANY,

14             Defendant.

15                       - - - - -

16

17              DEPOSITION OF BONNIE KRAMER

18

19   Taken on Wednesday, January 30, 2008, at 2:15 p.m.

20                  At the offices of:

21                   Cefaratti Group

22                 4608 St. Clair Avenue

23                   Cleveland, Ohio

24      Before Kathleen Davian, a Notary Public

25              in and for the State of Ohio

Page 2

1    APPEARANCES:
2    .
3        Via telephone
4        On behalf of the Plaintiffs:
5        THOMAS B. BACON, by
6        1515 Grant Street
7        Hollywood, Florida  33020
8        (954) 925-6488
9        Baconlaw@bellsouth.net
10    .
11        Via telephone
12        On behalf of the Defendant:
13        Meckler, Bulger & Tilson, by
14        MICHAEL I. LEONARD, ESQ.
15        123 North Wacker Drive
16        Suite 1800
17        Chicago, Illinois  60606
18        (312) 474-7925
19        Michael.Leonard@mbtlaw.com
20                ----
21    .
22    .
23    .
24    .
25    .

Page 3

1            BONNIE KRAMER, of lawful age,
2    called for examination, as provided by
3    the Federal Rules of Civil Procedure,
4    being by me first duly sworn, as
5    hereinafter certified, deposed and said
6    as follows:
7            EXAMINATION OF BONNIE KRAMER
8    BY-MR.LEONARD:
9        Q.  Ma'am, good afternoon.
10        A.  Hi.
11        Q.  As you know, my name is Mike
12    Leonard.  I represent the defendant.
13        A.  Hm-hm.
14        Q.  And today we're here to take
15    your deposition by telephone conference.
16    Okay.
17            I assume that you had your
18    deposition taken previously?
19        A.  I have.
20        Q.  Approximately how many times?
21        A.  Twice before.
22        Q.  Can you tell me how long ago
23    was that?
24        A.  I think the last deposition
25    was three weeks ago.

Page 4

1        Q.  What was the case called in
2    that case?
3        A.  RTA.
4        Q.  Kramer versus RTA?
5        A.  Correct.
6        Q.  And the other plaintiff in
7    that case is Disabled Patriots of
8    America?
9        A.  Yes.
10        Q.  Where is that case pending?
11        A.  In Cleveland, Ohio.
12        Q.  In federal court or state
13    court?
14        A.  Federal court.
15        Q.  And who are your attorneys
16    in that case?
17        A.  Tom Bacon and Larry Fuller.
18        Q.  And what firm is Mr. Fuller
19    with?
20        A.  I'm sorry?
21        Q.  Did you say Larry Fuller?
22        A.  Yes.
23        Q.  And what firm is he with?
24        A.  Fuller, Fuller.
25        Q.  Is that in Cleveland?

Page 5

1        A.  No, it's in Miami.
2        Q.  And what's the status of
3    that case?  It's just engaged in
4    discovery?
5        A.  Yeah, I think so.  Ask Tom,
6    he knows.
7        Q.  And then the other case that
8    you were deposed in?
9        A.  Crocker Park.
10        Q.  How do you spell that for
11    the record?
12        A.  C R O C K E R.
13        Q.  That's the defendant?
14        A.  Yes.
15        Q.  And you and Disabled Patriots
16    of America are the plaintiffs?
17        A.  Correct.
18        Q.  And that's in federal court
19    in Cleveland?
20        A.  Yes.
21        Q.  And what's the status of
22    that case?
23        A.  It is resolved.
24        Q.  And what was the resolution?
25        A.  The resolution that they

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

Page 6

1  decided to make the fixes on the
2  property to make it more accessible.
3          Q.  And who were your attorneys
4  in that case?
5          A.  Todd Shulby.
6          Q.  Can you spell that for the
7  record?
8          A.  T O D D, S H U L B Y.
9          Q.  And do you have your
10 deposition -- do you have copies of your
11 transcripts from those two cases?
12         A.  I don't have them, no.
13         Q.  Who has them?
14         A.  The court reporter.
15         Q.  Okay.  And do you know what
16 court reporter service you used for
17 those two depos?
18         A.  I do not know offhand but I
19 could -- I have -- obviously have copies
20 of where it was -- where they're being
21 stored at home.
22         Q.  And, ma'am, just for the
23 record, the rules are probably identical
24 to what you've been through before.  But
25 as you know I ask you verbal questions

Page 7

1  and ask you to give verbal responses.
2  From time to time Mr. Bacon may make
3  objections to the questions.  Because
4  it's by telephone, particularly, you
5  need to wait, let him say whatever he's
6  going to say, and then unless someone
7  tells you not to answer the question, to
8  proceed to answer the question, okay?
9          A.  Yes.
10         Q.  It's also important,
11 particularly, since it's by phone that
12 you wait until I finish my question
13 before you begin to answer it because
14 otherwise I won't hear what you've said
15 and the court reporter won't have a
16 clear record, okay?
17         A.  Yes.
18         Q.  Is there any reason because
19 of medications, tiredness, any other
20 reason whatsoever you can't give
21 complete and truthfully testimony here
22 today?
23         A.  No.
24         Q.  And you understand you've
25 been sworn?

Page 8

1          A.  Yes.
2          Q.  And if you need a break at
3  any time and there's not a question
4  pending, please let me know and we'll
5  accommodate you, okay?
6          A.  Yes.
7          Q.  Have you taken any
8  medications in the last 24 hours?
9          A.  Yes.
10         Q.  And what have you taken?
11         A.  I take heart prophylactic
12 medication every single day.
13         Q.  What medication is that?
14         A.  I take Lipitor.  I take
15 Metoprolol and I take something called
16 -- I'm blanking.  I have another
17 medication that I take every day.
18         Q.  I'm sorry, what was the last
19 one?
20         A.  I'm trying to think of the
21 name of it and I cannot think of the
22 name of it right now.
23         Q.  How often and what dosage do
24 you take of Lipitor?
25         A.  I take 10 milligrams of

Page 9

1  Lipitor at bedtime.
2          Q.  At bedtime?
3          A.  Yeah, 10 milligrams.
4          Q.  And the second one, Med --
5          A.  Metoprolol.
6          Q.  You take that how often and
7  how much?
8          A.  Every morning and I don't
9  know how much.
10         Q.  And you took that this
11 morning?
12         A.  Yes, I did.
13         Q.  And that doesn't affect your
14 ability to testify, right?
15         A.  Not at all.
16         Q.  And the third one, you don't
17 recall how often you take it and what
18 dosage?
19         A.  Right, I don't recall.
20         Q.  But I know you don't
21 remember the name of it but how often
22 do you take --
23         A.  I take it every morning.
24         Q.  Okay.
25         A.  And I can't tell you the

3 (Pages 6 to 9)

Page 10

1    dosage offhand.
2         Q. And all three of those are
3    for your heart?
4         A. Yes.
5         Q. And likewise, the third does
6    not impede your memory in any way?
7         A. Not at all.
8         Q. Do you take any other
9    medications at all?
10        A. No.
11        Q. Hello?
12        A. No.
13        Q. Okay. And that's, again,
14   you need to wait for a second, so that
15   the question's fully done because
16   otherwise I don't hear your answer.
17             Ma'am, I want to ask you first
18   some questions about your background
19   before we get to that.
20             What did you do to prepare to
21   testify here today?
22        A. Talked to my attorney.
23        Q. Mr. Bacon?
24        A. Yes.
25        Q. When?

Page 11

1         A. Yesterday.
2         Q. On the phone?
3         A. Yes.
4         Q. For how long?
5         A. I don't know how long it
6    was.
7         Q. Was it less than a half
8    hour?
9         A. Probably, yeah.
10        Q. Was it just the two of you
11   as part of --
12        A. Mr. Fuller was present on
13   the conference call as well.
14        Q. Is Mr. Fuller serving as one
15   of the attorneys in this case?
16        A. Yes, he is.
17        Q. And did you review any
18   documents when you had this meeting
19   yesterday?
20        MR. BACON: Objection. Mr.
21   Fuller was not participating. Mr.
22   Fuller is not --
23        A. I'm sorry, I confused my
24   cases. That's correct, just Mr. Bacon.
25        Q. So you had a telephone

Page 12

1    conference yesterday and who was it
2    with?
3         A. Just Tom Bacon and not --
4         Q. Not Mr. Fuller?
5         A. Not Mr. Fuller.
6         Q. And that conversation lasted
7    less than half an hour?
8         A. Yes.
9         Q. Did you look at any
10   documents during the conference?
11        A. Some photographs.
12        Q. Photos?
13        A. Yes.
14        Q. How many?
15        A. I don't know.
16        Q. Approximately, ma'am.
17        A. 20.
18        Q. Are these pictures that you
19   took?
20        A. Yes.
21        Q. And they are of the premises
22   described in the complaint in this case?
23        A. Yes, they are pictures that
24   my boyfriend took.
25        Q. Who's your boyfriend?

Page 13

1         A. David Lott.
2         Q. Can you spell his name for
3    the record?
4         A. D A V I D, L O T T.
5         Q. Where does he live?
6         A. In Cleveland Heights, Ohio.
7         Q. And what's his address?
8         A. 2393 South Taylor Road,
9    Cleveland Heights, Ohio, 44118.
10        Q. I'm sorry?
11        A. 2393.
12        Q. What's the street?
13        A. South Taylor Road.
14        Q. South Taylor Road?
15        A. Cleveland Heights, Ohio
16   44118.
17        Q. And there are 20 pictures?
18        A. Yes.
19        Q. Colored or --
20        A. Black and white.
21        Q. Do you have them with you
22   here today?
23        A. No.
24        Q. And what other documents or
25   notes or anything else did you have with

4 (Pages 10 to 13)

Page 14

1  you during the telephone conference
2  yesterday?
3       A. Nothing.
4       Q. How long have you had a
5  relationship with Mr. Lott?
6       A. 15 years.
7       Q. Are you married?
8       A. No.
9       Q. Have you ever been married
10 to him?
11      A. No.
12      Q. Have you ever been married?
13      A. Yes.
14      Q. When?
15      A. A long time ago. I got
16 married in 1978 and I was married for
17 13 years.
18      Q. To who?
19      A. To Paul Balzer.
20      Q. Can you spell the last name
21 for the record?
22      A. B A L Z E R.
23      Q. And where does he currently
24 reside?
25      A. Albany, New York.

Page 15

1       Q. And where was the divorce
2  filed?
3       A. Cleveland, Ohio.
4       Q. In state court?
5       A. Yes.
6       Q. And have you been married
7  since this time?
8       A. No.
9       Q. Mr. Lott, what's his phone
10 number?
11      A. 216-702-5648.
12      Q. So just to be clear. The
13 only things you looked at while you had
14 the meeting to prepare for your
15 deposition was these photographs?
16      A. Correct.
17      Q. And when did Mr. Lott take
18 those photographs?
19      A. On the trip -- on a vacation
20 that we took to Chicago last summer to
21 visit my son.
22      Q. And what year was that,
23 ma'am?
24      A. 19 -- I'm sorry, 2007.
25      Q. How did you get from

Page 16

1  Cleveland to the Chicago area?
2       A. Drove in a car.
3       Q. Who drove?
4       A. David Lott.
5       Q. Are you able to drive,
6  ma'am?
7       A. No.
8       Q. When was the last time you
9  drove a car?
10      A. 1995.
11      Q. And why did you stop
12 driving?
13      A. When I went into the
14 wheelchair or I was starting to not feel
15 as comfortable in control of the car
16 moving my feet.
17      Q. Are you physically able to
18 drive, if you want to?
19      A. If I could have hand
20 controls.
21      Q. Have you ever tried to drive
22 since 1995?
23      A. No.
24      Q. Has anyone ever told you you
25 can't drive?

Page 17

1       A. No.
2       Q. Do you have a license?
3       A. No.
4       Q. When did you last have a
5  license?
6       A. It's been a long time. It's
7  probably been at least eight years since
8  I've had a driver's license.
9       Q. Do you have any more
10 specific date when it was that you and
11 Mr. Lott went to visit your son in
12 Chicago in 2007 when he took those
13 pictures?
14      A. The beginning of August. I
15 can't tell exact dates. I need to look
16 at the calendar but even then I'd have
17 a hard time remembering.
18      Q. So there's nothing that would
19 tell us where the specific date --
20      A. Well, I stayed in hotels so
21 there might be a record that I can fish
22 out.
23      Q. You still have those receipts
24 you think?
25      A. Sure.

5 (Pages 14 to 17)

Page 18

1   Q. And your son, his name is?
2   A. Matthew Fields.
3   Q. Spell his last name for the
4   record.
5   A. F I E L D S.
6   Q. And what's his address?
7   A. I don't know offhand.
8   Q. What town does he live in?
9   A. Chicago proper.
10  Q. In Chicago city?
11  A. Yeah.
12  Q. Did he ever live anywhere
13  else in the Chicago area?
14  A. No.
15  Q. And when you went to visit
16  your son in the -- you went to visit
17  your son in the City of Chicago, what
18  were you doing in town where this
19  premises was located?
20  A. Well, he's a disc jockey for
21  one thing. He had a sick client so we
22  went out someplace.
23  Q. First of all, how many days
24  were you visiting your son on this
25  occasion?

Page 19

1   A. Four days.
2   Q. And where did you stay?
3   A. Different places. We stayed
4   at Skokie. A place in Skokie,
5   Doubletree.
6   Q. Okay.
7   A. Spent two nights there and
8   I'm trying to remember. We stayed in
9   the city proper at the Tremont Hotel in
10  Chicago in the city.
11  Q. Okay.
12  A. I think that's it.
13  Q. And do you stay with your
14  son at all?
15  A. No, I can't get into his
16  space.
17  Q. Because of your wheelchair?
18  A. Yes.
19  Q. And he lives somewhere in
20  the City of Chicago but you don't know?
21  A. Well, he moved recently so
22  he just used to live on West Belmont so
23  I don't remember.
24  Q. What brought you to the
25  premises that's described in the

Page 20

1   complaint sometime in August of 2007?
2   A. Well, we were driving, again,
3   out in what felt like the boonies and
4   we saw a mall that had a Best Buy and
5   he was looking for something. I needed
6   to pick up something at the drug store
7   and there was a Super Dominic's
8   supermarket. I wanted something there
9   also.
10  Q. So let me get this. Where
11  were you going on that occasion?
12  A. Matthew was going to
13  interview -- be interviewed by a client
14  in the -- a prospective client or
15  something in Arlington.
16  Q. In Arlington. Do you have
17  -- that's the name of the town?
18  A. Yes.
19  Q. It's called Arlington?
20  A. Yes.
21  Q. And you had never been in
22  that town ever before?
23  A. No, never.
24  Q. And who was driving?
25  A. David, my boyfriend.

Page 21

1   Q. So just the three of you?
2   A. Yes.
3   Q. And you said who initially
4   wanted to stop?
5   A. We both wanted to stop. It
6   was a really hot day.
7   Q. Your son wanted to go to
8   Best Buy?
9   A. Yes, it was a very, very hot
10  day. That's what I can remember
11  driving.
12  Q. So he went to Best Buy to
13  get what?
14  A. A CD.
15  Q. To get what?
16  A. A CD.
17  Q. Okay. And you wanted to go
18  where?
19  A. Jump into Dominic's and get
20  some fruit.
21  Q. And how long would you say
22  you and your son and David were at
23  these facilities?
24  A. Less than an hour.
25  Q. And why was it that David

6 (Pages 18 to 21)

Page 22

1  had a camera with him?
2      A. David always has a camera
3  with him.
4      Q. Why is that?
5      A. Well, a couple of things.
6  He has it in his work but also that we
7  -- I'm an advocate, and so I'm looking
8  for things that are and aren't
9  accessible always.
10     Q. Okay. And what is the
11 nature of David's business?
12     A. He's a Realtor.
13     Q. Who does he work for?
14     A. Avalar.
15     Q. Can you spell that for us?
16     A. A V A L A R.
17     Q. Is that Cleveland?
18     A. Yes, it is.
19     Q. Does Mr. Lott have any sort
20 of disabilities?
21     A. No.
22     Q. Is he a member of Disabled
23 Patriots?
24     A. No.
25     Q. Has he ever been?

Page 23

1      A. No.
2      Q. Okay. And did you ask him
3  to take these pictures?
4      A. Sure.
5      Q. And that's the only reason
6  he took them?
7      A. Yes.
8      Q. And where is the first place
9  you went -- first of all, I take it
10 your son or David pulled the car in the
11 parking lot?
12     A. Yes.
13     Q. And where did they park it?
14     A. I don't even remember where
15 we parked truly.
16     Q. Any idea whatsoever, ma'am?
17     A. No.
18     Q. And did David take any
19 pictures of the area where you parked?
20     A. Yeah, there was a lot wrong
21 with the parking lot.
22     Q. I just want to know yes or
23 no. Did David take any pictures of the
24 parking area where you parked?
25     A. Yes.

Page 24

1      Q. And out of these 20 or so
2  pictures, how many of them relate to the
3  parking lot area?
4      A. I don't know. I can't
5  remember.
6      Q. What's depicted in any of
7  the pictures about the parking lot?
8      A. As I remember, there were
9  numerous things wrong.
10     Q. Well, we're just focusing
11 specifically on the parking lot only.
12     A. Okay.
13     Q. First of all, how many
14 things were wrong?
15     A. Numerous things.
16     Q. What does that mean? Does
17 that mean one, two, five, ten?
18     A. I don't know. More than two
19 and probably less than ten.
20     Q. I want to walk through each
21 thing that was wrong and we'll talk
22 about the specifics. So just first of
23 all, list for me the things that were
24 wrong and then we'll get into the
25 details of those.

Page 25

1      A. Okay. All the signage was
2  wrong to mark spots.
3      Q. What's the next thing?
4      A. There were no access aisles
5  to get from the parking -- from the car
6  to the store without putting -- going
7  behind cars which puts you in jeopardy.
8      Q. Without what?
9      A. You have to go -- when you
10 have to go behind the automobiles to get
11 into the store, that's against the ADA
12 and it's dangerous.
13     Q. Okay. What else?
14     A. Uneven levels in the parking
15 lot.
16     Q. Okay. What else?
17     A. Those are really the things
18 that I can remember.
19     Q. Okay. Now, this is a pretty
20 large facility. There's all sort of
21 different stores there, isn't there,
22 ma'am?
23     A. Hm-hm.
24     Q. You have to say yes or no.
25     A. Yes.

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

1  Q. Okay. And you have no idea
2 whatsoever what store you parked near?
3  A. Not initially, no. I know
4 that ultimately we drove around the
5 entire shopping area.
6  Q. Okay. Just name for me the
7 different stores that are in that
8 shopping area.
9  A. There's a Dominic's. There's
10 a Walgreens. There's a Jo-Ann Fabrics.
11 There was a Best Buy, as I said. There
12 was a Catherine's plus size women's wear
13 store.
14  Q. Anything else?
15  A. That's what I remember.
16  Q. Okay. And are they all part
17 of the same facility or are they all
18 independent and separate facilities?
19  A. I'm pretty sure that Best
20 Buy was freestanding, a stand alone.
21 Oh, there was an Old Country Buffet
22 there, also.
23  Q. Is that located in the
24 parking lot?
25  A. It was -- yeah, I think that

1 the area you parked, you parked in a
2 disabled spot, right?
3  A. Yes.
4  Q. And there was a sign saying
5 it was a disabled spot, right?
6  A. Yes.
7  Q. And describe for me as
8 specifically as you can what the sign
9 that you saw looked like and what it
10 said.
11  A. Well, it looked like the
12 traditional handicap parking marker but
13 if they're not put at the right height
14 when you're driving through the parking
15 lot, it's hard to see where the handicap
16 parking is.
17  Q. Well, that wasn't my
18 question, ma'am. I just want you to
19 describe, as specifically as you can,
20 what the sign said, what color it was,
21 all the details about the sign that you
22 were talking about.
23  A. If I'm correct, the sign is
24 blue and it's got the handicap logo.
25  Q. And so with respect to that

1 had an entrance from the parking lot.
2  Q. But out of all those various
3 stores, you have no idea where you
4 parked the car?
5  A. No.
6  Q. Okay. And it was only
7 parked in one spot, right?
8  A. Right.
9  Q. Okay. Now, with respect to
10 the signs, you said all the signs were
11 wrong.
12  A. Right.
13  Q. Explain in more detail what
14 you're talking about.
15  A. Well, they couldn't be seen.
16 As you were driving around, you wouldn't
17 be able to like really easily find a
18 handicap parking space.
19  Q. Well, what does the sign say
20 that you're talking about?
21  A. Well, they said -- I mean,
22 they were marked with the disabled
23 signage but they weren't easily seen.
24 They weren't at the right height.
25  Q. Okay. So there were -- in

1 sign, apart from the height issue which
2 we'll get into in a minute, there was
3 no issue or problem whatsoever except
4 for the height; is that correct?
5  A. Not that I can remember.
6  Q. Okay. And what height was
7 the sign that you're talking about?
8  A. I don't know but I know that
9 it wasn't up high enough to see, as you
10 were driving around in the parking lot.
11  Q. So you have no idea
12 whatsoever how high it was?
13  A. No. No, I don't.
14  Q. And you didn't take any
15 measurements?
16  A. No.
17  Q. Well, certainly it was higher
18 than your car, wasn't it, ma'am?
19  A. Yeah, but that's not -- I
20 mean, it was little Honda, so it wasn't
21 saying much that it was higher than the
22 car.
23  Q. Okay. But you can't give me
24 any more detail about its height, can
25 you?

Page 30

1        A.  No.
2        Q.  Okay.  And so with regard to
3   this problem or alleged problem with the
4   sign, that's the only problem you can
5   think of?
6        A.  With the sign.
7        Q.  Yeah.
8        A.  Yes.
9        Q.  That's it?
10        A.  Yes.
11        Q.  Now, you also said something
12   about marked spots.
13        Was there some problem with the
14   marking of the spots?
15        A.  No.  What I'm saying, if the
16   sign's not high enough when you're
17   driving through, you can't see where the
18   handicap spots are.
19        Q.  Okay,  Well, you're saying
20   in general that could be a problem but
21   certainly you saw the sign and parked in
22   the spot, didn't you, ma'am?
23        A.  Ultimately.
24        Q.  Okay.  Now, there's no other
25   problem with the markings on the spots,

Page 31

1   was there, ma'am?
2        A.  No.
3        Q.  Now, with respect to the
4   second thing you pointed out in the
5   parking lot, you said there were no
6   access aisles from the car to the store,
7   right?
8        A.  Correct.
9        Q.  And explain what exactly do
10   you mean by that.  When you got out of
11   the car, you're saying that to get to
12   the store you had to walk behind cars
13   like people normally do in a parking
14   lot?
15        A.  Yeah, except for one thing.
16   I'm not the height of people walking
17   through the parking lot.  So it would
18   be really hard for a driver to see my
19   wheelchair passing behind it.
20        Q.  Well, that would be a
21   problem anywhere you went in this
22   country, wouldn't it, ma'am?
23        A.  Anything there's not an
24   access aisle.
25        Q.  I'm just talking about in

Page 32

1   general.  When you're using your
2   wheelchair or someone's pushing your
3   wheelchair, there always can be a
4   potential problem that someone might see
5   you in their rearview, right?
6        A.  Correct.
7        Q.  Okay.  Now, and when you
8   were walking through this particular
9   parking lot you didn't have any
10   encounters where you were put in danger
11   because of that, correct?
12        A.  But you're always in danger
13   when you're passing behind a car.
14        Q.  Well, that wasn't my
15   question.  When you walked through this
16   particular parking lot on that
17   particular occasion, you had no problems
18   whatsoever in terms of cars getting
19   close to you, almost hitting you,
20   anything like that?
21        A.  No.
22        Q.  And this access aisle, are
23   you saying there was no access aisles at
24   all?
25        A.  Not that -- not in the place

Page 33

1   where I parked, no.
2        Q.  Well, did you look, ma'am,
3   anywhere else in the facility to see if
4   there are any access aisles or not?
5        A.  Some of the parking spaces,
6   after we started looking, did have some
7   access and some were without.
8        Q.  Okay.  Well, first of all,
9   how many total parking areas for
10   disability parking were there at this
11   facility, ma'am, at the time?
12        A.  Well, there were all kinds
13   of handicap spots in front of stores.
14        Q.  Well, you know, you told me
15   some of them had access aisles and some
16   of them didn't, right?
17        A.  Yes.
18        Q.  Okay.  Well, in total how
19   many were there with access aisles and
20   how many where they didn't have access
21   aisles?
22        A.  I don't remember.
23        Q.  What?
24        A.  I don't remember.
25        Q.  You can't tell me anything

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

Page 34

1  at all about that?
2      A. No.
3      Q. Okay. And you didn't bother
4  to count at the time?
5      A. No.
6      Q. Okay. And you didn't take
7  any notes whatsoever while you were
8  there?
9      A. No.
10      Q. And you didn't make any
11  report while you were there?
12      A. No.
13      Q. And you didn't make any
14  complaint to anybody while you were
15  there?
16      A. No.
17      Q. And you never complained to
18  any of the stores in the facility after
19  you left, correct?
20      A. That is correct.
21      Q. And how far was -- since we
22  don't have any idea where you parked,
23  right, because you don't remember that,
24  right?
25      A. Correct.

Page 35

1      Q. And so can you give me any
2  indication of how far away an access
3  aisle was from where you did park?
4      A. A ways away.
5      Q. Well, what does that mean?
6  Are you talking --
7      A. I don't even know that I
8  remember that there was any access
9  aisle.
10      Q. Well, you just told me that
11  there was.
12      A. In other parking places. In
13  other parking areas but not where I
14  parked.
15      Q. I understand that. But what
16  I'm saying is, wherever it was that you
17  parked, where was the closest access
18  aisle to where you parked?
19      A. I can't tell you that.
20      Q. Any idea whatsoever?
21      A. No.
22      Q. Okay. Now, when you were
23  there, ma'am, why didn't you point out
24  the problem with the sign or the problem
25  with the access aisles to anybody at any

Page 36

1  facilities?
2      A. Because if I did that,
3  that's all I would ever do in my life.
4  There would never be anything but
5  complaining about things that are not
6  right or safe.
7      Q. Well, ma'am, you waited to
8  file this lawsuit. What I'm asking is,
9  why at any time prior to filing this
10  lawsuit didn't you bother to pick up the
11  phone or send a letter or send an
12  e-mail or try to contact anyone and tell
13  them about these alleged problems?
14      A. Sir, if you could have a
15  sense of how much I e-mail people
16  telling them or asking them to pay
17  attention to the fact that their places
18  are not ADA compliant, it would be a
19  tome of complaints that I -- and e-mails
20  that I've made. I'm used to not
21  getting any kind of acknowledgment at
22  all and that's why I don't always do
23  it. It's --
24      Q. This facility you never
25  tried, right?

Page 37

1      A. No, I did not.
2      Q. Okay. Now, have you told me
3  everything that was in your mind
4  improper with respect to the access
5  aisles?
6      A. Yes.
7      Q. Okay. Now, you also stated
8  that there was some what you call uneven
9  levels in the parking lot and I'm trying
10  to understand what you're talking about.
11  What do you mean?
12      A. When the pavement changes
13  level, that's not a gigantic issue for a
14  walker. It is a gigantic issue
15  sometimes for someone in a chair.
16      Q. Okay. Just so I'm clear.
17  Between the time where you parked in
18  this unknown spot until you went into
19  the first building and what building was
20  that?
21      A. It was a mall entrance.
22      Q. Okay. And where was the
23  mall entrance? What store was it near?
24      A. I want to say Jo-Ann Fabric.
25  That sticks in my mind.

10 (Pages 34 to 37)

Page 38

1    Q. Well, is that it or are you
2  just speculating?
3    A. I'm speculating.
4    Q. So you don't have any idea
5  what entrance you actually went in?
6    A. It was on a side where the
7  Catherine's store was on that side also.
8    Q. That's the best you can say?
9    A. Yes.
10    Q. And how long -- many feet
11  was it approximately from where you
12  parked to where you went in this
13  entrance?
14    A. I don't know. I'm not very
15  good at judging that.
16    Q. I mean, are we talking about
17  10 feet, more like 50 feet --
18    A. No.
19    Q. -- or like a hundred feet?
20    A. No, probably, again,
21  somewhere between 10 and 50 feet I would
22  guess.
23    Q. That's your best estimate?
24    A. That's my best estimate.
25    Q. Okay. And when you were

Page 39

1  walking -- you use the wheelchair
2  yourself or someone push you?
3    A. Well, it depends. On this
4  occasion I was being pushed because I
5  was in my manual wheelchair. Most of
6  the time I use my power wheelchair.
7    Q. Okay. And why didn't you
8  have the power wheelchair?
9    A. Because it doesn't fit in
10  the car.
11    Q. And who was pushing you?
12    A. David or --
13    Q. Okay.
14    A. -- or Matthew. I don't
15  remember.
16    Q. So you're saying that when
17  you were walking or he was pushing you
18  for these 10 to 50 feet, you felt like
19  you went over some uneven ground?
20    A. Yeah.
21    Q. Meaning that there was just
22  very -- like you might find on a street
23  or a parking lot, just it's not quite
24  the same consistency everywhere?
25    A. Right.

Page 40

1    Q. And that's the best you can
2  say about that?
3    A. Yeah. I mean, it was enough
4  that it caught my attention to even
5  mention it.
6    Q. So they didn't tip you over
7  or anything like that?
8    A. No, but under different
9  circumstances it can.
10    Q. But it didn't on that
11  occasion?
12    A. No, it did not.
13    Q. And is that the only spot
14  where it was uneven, ma'am?
15    A. No, there were other places
16  that were uneven also.
17    Q. Where would we find these
18  places? How would we locate where they
19  are anywhere in the parking lot?
20    A. I mean, if you would take a
21  walk around, you would be able to see
22  places that are not level.
23    Q. Well, I'm not talking about
24  doing it now, ma'am. Do you have any
25  idea as you sit here now under oath

Page 41

1  where these spots are in the parking
2  lot?
3    A. No.
4    Q. Okay. And you have nothing
5  that would tell us where they are?
6    A. No.
7    Q. And you have no idea how
8  many of these spots you're talking
9  about?
10    A. No.
11    Q. Okay.
12    A. Several.
13    Q. Excuse me?
14    A. Several.
15    Q. Several. Is the best you
16  can say several?
17    A. Yes.
18    Q. That might be two or three?
19    A. Yes.
20    Q. Okay. But you can't tell me
21  anything about the two or three spots?
22    A. No.
23    Q. Okay. Have you told me
24  everything about this parking lot at
25  this large facility that you feel was

11 (Pages 38 to 41)

Page 42

1  improper?
2       A.  Yes.
3       Q.  Okay.  Nothing else
4  whatsoever?
5       A.  I'm telling you everything I
6  can remember.
7       Q.  Okay.  Now, with respect to
8  the physical facility itself, any of
9  these stores or mall areas or anything
10 like that, what is the next thing that
11 you think is wrong or in violation?
12      A.  Well, there were all kind of
13 things that were wrong and in violation.
14      Q.  Well, tell me the next
15 thing, ma'am.
16      A.  There were bathroom -- there
17 was a bathroom I went into where the --
18 just to note, the sink wasn't wrapped
19 underneath, so if I pulled under, I was
20 at jeopardy of burning myself on a pipe.
21      There was a bathroom that had
22 women's machines, the sanitary napkin
23 dispenser and stuff was at the wrong
24 height that I couldn't use.
25      There were hooks on the back of

Page 43

1  bathroom -- the commode doors that I
2  couldn't hang anything on.
3       The flush on the toilet was on
4  the wrong side.
5       The grab bars weren't in the
6  right place and one wasn't long enough
7  to support standing up comfortably.
8       Q.  Anything else with respect to
9  the bathrooms?
10      A.  Nothing that I can remember.
11      Q.  Okay.  This bathroom that
12 we're talking about, where was it
13 located?  Was it in one of these
14 stores?
15      A.  Yeah.
16      Q.  It was?
17      A.  I'm pretty sure it was in
18 the store, yes.
19      Q.  But you don't know for sure?
20      A.  I don't remember.
21      Q.  And you don't know what
22 store it was in?
23      A.  No.
24      Q.  Okay.  No idea at all?
25      A.  I know that I went into

Page 44

1  certain stores and it was -- it had to
2  have been one of those, I think.
3       Q.  But you have no idea what
4  store it was in?
5       A.  It had to be an accessible
6  bathroom.  No.
7       Q.  Now, and you went into one
8  bathroom?
9       A.  I went in to use a bathroom,
10 yes.
11      Q.  Just one?
12      A.  Yes.
13      Q.  Okay.  So the hour you were
14 there or so you just went in one
15 bathroom?
16      A.  Yes.  I know David and
17 Matthew went to the bathroom, as well.
18      Q.  But you never went into
19 their bathrooms, did you?
20      A.  No, I didn't go into the
21 men's bathroom.
22      Q.  Okay.  At any time, right?
23      A.  Right, at any time.
24      Q.  Okay.  So with respect to
25 these problems you described for me,

Page 45

1  they were all based upon your own visual
2  observations in one bathroom but you
3  can't identify the location, right?
4       A.  That is correct.
5       Q.  And you said that in this
6  bathroom -- first of all, you spent
7  what, about three or four minutes in
8  there?
9       A.  No, no, no, no, no.
10      Q.  What?
11      A.  There's no such thing as
12 three or four minutes.  It takes some
13 time to figure out how to use the
14 bathroom and using it especially -- it's
15 time consuming when everything is right
16 and it's more time consuming when things
17 are not correct.
18      Q.  Okay.  Well, with respect to
19 this bathroom you were in, ma'am, how
20 much time did you spend in there?
21      A.  At least ten minutes.
22      Q.  Did you take any pictures?
23      A.  Yes.
24      Q.  You took them?
25      A.  No, I think actually David

12 (Pages 42 to 45)

Page 46

1  came in and poked his head in and took
2  some.
3        Q.  So he took some pictures
4  later?
5        A.  Yeah.
6        Q.  Did he take any pictures of
7  any other bathrooms?
8        A.  I think he did.
9        Q.  You don't know if he did or
10  not?
11        A.  No, he did.  He did -- he
12  took some pictures of a men's bathroom
13  that was not correct either.
14        Q.  Okay.  Well, the pictures
15  that you have, are we able to tell by
16  looking at the pictures if it's the
17  men's bathroom or if the women's
18  bathroom or anything like that?
19        A.  Yeah.
20        Q.  Okay.  So whatever pictures
21  there are, there's markings that will
22  tell us which one's the women's one and
23  which one's the men's one?
24        A.  Where you see the sanitary
25  napkins, that's the women's.

Page 47

1        Q.  Okay.  And then the pictures
2  of the men's bathroom, is it one
3  bathroom or is it more than one?
4        A.  I think it was one or two
5  bathrooms, I can't be sure.
6        Q.  Okay.  And what facilities
7  or locations were the other bathrooms,
8  in the men's bathrooms?
9        A.  I don't know.  I don't
10  remember.
11        Q.  No idea at all?
12        A.  Hm-hm.
13        Q.  No idea at all?
14        A.  No.  No, I don't remember.
15        Q.  Now, with respect to the
16  bathroom you actually spent some time
17  in, you said the sink was not wrapped
18  underneath, so that if your leg would
19  have touched the pipe underneath the
20  sink, it might have got burned?
21        A.  Yeah, that's why they wrap
22  those things.
23        Q.  That didn't happen to you,
24  did it, ma'am?
25        A.  No, it didn't because I was

Page 48

1  cautious because I saw it wasn't
2  wrapped.
3        Q.  And are you aware of anyone
4  ever getting their leg burned against
5  that sink in that bathroom?
6        A.  Am I aware of personally
7  someone in my life having their leg
8  burnt under a sink, no.
9        Q.  Yeah.
10        A.  No.
11        Q.  Okay.  And certainly, you're
12  not aware of anyone at this facility
13  that ever happening to, right?
14        A.  That is correct.
15        Q.  And you didn't do any tests,
16  such as turning on the hot water or
17  anything like that to see if the pipe
18  would get warm, did you, ma'am?
19        A.  I washed my hands.
20        Q.  And you didn't touch the
21  pipe to see if it was warm, did you,
22  ma'am?
23        A.  No.
24        Q.  So whether it was wrapped or
25  not, you have no idea what the

Page 49

1  temperature of it was or whether it was
2  even hot to the touch, right?
3        A.  No, but I do know that the
4  law asks that pipes be wrapped.
5        Q.  I understand that.  But you
6  have no idea whether -- even if it one
7  ran the hottest water possible, whether
8  or not the pipe was even hot to the
9  touch, correct?
10        A.  No, I do not.
11        Q.  Because you didn't do that,
12  right?
13        A.  Right.
14        Q.  All right.  And was there
15  anything -- any other problem besides
16  this -- with respect to the pipe only,
17  was there any other problem with the
18  pipe other than it wasn't wrapped?
19        A.  I'm not aware of any.
20        Q.  And what should it have been
21  wrapped with?
22        A.  Some kind of like -- it's
23  usually a plastic coating that gets
24  wrapped around the pipes, so if you do
25  happen to put your knee under there or

13 (Pages 46 to 49)

Page 50

1  your legs and it is really hot, so that
2  you don't get burnt.
3       Q. Are you aware with anyone
4  besides yourself with a disability who's
5  ever in any of the bathrooms at this
6  site?
7       A. I would have to think that
8  in life that there was someone in a
9  wheelchair in that bathroom.
10      Q. Well, no, I don't want you
11 to speculate or make up. You have no
12 knowledge of that, right?
13      A. No.
14      Q. Okay. Now, with respect to
15 the next problem you identified in the
16 bathroom and now I can't even read my
17 own notes is the pipe sink issue. The
18 next thing before the hooks, I'm sorry,
19 what did you say?
20      A. There was a hook on the back
21 of the commode door to hang something
22 but it was not in my reach.
23      Q. Okay. It wasn't at your
24 reach of your sitting in your
25 wheelchair?

Page 51

1       A. Correct.
2       Q. What was the height of it?
3       A. I couldn't tell you but it
4  was at least -- it was outside of my
5  arm span while sitting.
6       Q. But you have no idea what
7  height it was?
8       A. No.
9       Q. What color was the hook?
10      A. Silver.
11      Q. And you didn't do any
12 measurements?
13      A. No.
14      Q. Okay. Are you able to stand
15 up?
16      A. I'm able to transfer.
17      Q. What does that mean?
18      A. That means that I can stand
19 and hold onto grab bars and turn myself
20 around to sit on the commode.
21      Q. Okay. So you didn't try to
22 stand and try to reach into the hook,
23 correct?
24      A. No, that wasn't --
25      Q. You didn't actually try to

Page 52

1  put anything on the hook, did you?
2       A. I couldn't get my purse on
3  the hook, I can tell you that.
4       Q. I know that may have been
5  the case but you didn't try to do that,
6  did you?
7       A. Well, I saw that I couldn't
8  reach it so there was no point.
9       Q. Well, that's not my question.
10 You didn't try to put anything on the
11 hook at all, did you, ma'am?
12      A. No.
13      Q. And how large was the
14 bathroom? It was how many feet by how
15 many feet?
16      A. I can't tell you.
17      Q. Any idea at all?
18      A. It was a standard stall.
19 Whatever the largest stall is.
20      Q. So a large size stall?
21      A. Yeah.
22      Q. Just one freestanding toilet
23 unit?
24      A. Yes.
25      Q. No stall -- no individual

Page 53

1  stalls within the bathroom?
2       A. No, I'm saying inside the
3  bathroom that had more than one stall.
4       Q. Okay. So how many stalls
5  were there?
6       A. I don't know.
7       Q. Any idea at all?
8       A. No.
9       Q. Okay. And you were in a
10 stall with a door that closed?
11      A. Yes.
12      Q. Okay. And how many of those
13 were there in this bathroom?
14      A. I couldn't tell you.
15      Q. No idea at all?
16      A. Hm-hm. No.
17      Q. Okay. And with respect to
18 the stall you were in, there were no
19 grabs bars?
20      A. There were grab bars but the
21 grab bar that was at the back of this
22 stall at the back of the toilet was not
23 regulation length, making it much harder
24 for me to get up and get balanced and
25 turn around.

14 (Pages 50 to 53)

Page 54

```
 1        Q.  Okay.  But you were able to
 2   do that, right?
 3        A.  With much difficulty.
 4        Q.  And so according to you,
 5   there was a grab bar that wasn't present
 6   where it should have been at the back
 7   of the toilet?
 8        A.  Correct.
 9        Q.  And it wasn't there at all
10   or it just wasn't at the right height?
11        A.  It wasn't at the right
12   height.
13        Q.  And what height was it at?
14        A.  No, the height was all
15   right.  It wasn't wide enough.
16        Q.  It wasn't what?
17        A.  The bar was not wide enough
18   for me to do the requisite turning
19   around which is complex to start with.
20        Q.  What do you mean wide
21   enough?
22        A.  The bar -- there's a length
23   of a bar, right, if you were standing
24   it on the floor it would be two feet or
25   three feet or four feet long, and it
```

Page 55

```
 1   wasn't regulation length.
 2        Q.  And what's the length
 3   supposed to be?
 4        A.  I don't know but I know that
 5   it wasn't because I've seen a lot --
 6        Q.  Even though you don't know
 7   what the regulation length you're
 8   talking about but you say this one
 9   wasn't?
10        A.  No, I could tell you
11   absolutely it was not.
12        Q.  Okay.  Did you do any
13   measurements?
14        A.  No.
15        Q.  Can you tell me how many
16   inches, feet or otherwise it didn't
17   comply with the standard, as you're
18   talking about?
19        A.  It was at least 2 feet
20   short.
21        Q.  Okay.  So we don't know what
22   the standard is that we're comparing it
23   to, right?
24        A.  Correct.
25        Q.  And were any pictures taken
```

Page 56

```
 1   of this bar?
 2        A.  Yes.
 3        Q.  Okay.  And is there a
 4   picture that tells us that this bar was
 5   in the women's bathroom versus some
 6   other bathroom?
 7        A.  No.
 8        Q.  So --
 9        A.  I don't think so.
10        Q.  -- looking at the various
11   pictures, we have no idea which grab
12   bar --
13        A.  Right.
14        Q.  -- bathroom this one's in?
15        A.  That is correct.
16        Q.  So there's really no evidence
17   apart, from your testimony about the
18   grab bar?
19        A.  Correct.
20        Q.  Okay.  And the hooks, is
21   there any picture of the hook in your
22   bathroom?
23        A.  Yes.
24        Q.  And are we able to tell by
25   looking at the pictures that the hook
```

Page 57

```
 1   you're talking about is in this
 2   particular bathroom?
 3        A.  I'm not sure.
 4        Q.  No idea at all?
 5        A.  I'm not sure.
 6        Q.  Now, you said I think the
 7   next thing was the toilet flusher was on
 8   the wrong side?
 9        A.  Yeah.
10        Q.  And what side is it supposed
11   to be on?
12        A.  The outside.
13        Q.  Okay.  Well --
14        A.  The outside.  Not close so
15   that you have to reach across the toilet
16   to flush the toilet.
17        Q.  Well, where was the -- where
18   was the flusher at?
19        A.  On the inside.
20        Q.  I mean, on your right side?
21        A.  No, closer to the wall, as
22   opposed to closer to the open area.
23        Q.  Okay.  So if you were
24   sitting --
25        A.  It was on the left side.
```

15 (Pages 54 to 57)

Page 58

1      Q.  Okay.  So if you're sitting
2  on the toilet, it would on be on the
3  left side of the toilet?
4      A.  Hm-hm.
5      Q.  You have to say yes or no.
6      A.  Yes.
7      Q.  And you think it should have
8  been on the right?
9      A.  I don't think.  I know it
10 should have been on the right side.
11     Q.  And why is that?
12     A.  Because it's the law.
13     Q.  It has to be on the right
14 side instead of the left?
15     A.  That is correct.
16     Q.  Is there any pictures --
17     A.  It has to be -- it has to be
18 on the open side.
19     Q.  It has to be on the side
20 that's away from the wall?
21     A.  Right.
22     Q.  Okay.  Are there any
23 pictures of this?
24     A.  Yes.
25     Q.  And from the pictures, can

Page 59

1  we tell what bathroom you're talking
2  about?
3      A.  I'm pretty sure you can.
4      Q.  Okay.  You obviously were
5  able to flush the toilet, ma'am, right?
6      A.  Ultimately.
7      Q.  Okay.  And do you know
8  anybody out there who ever had a problem
9  with the toilet?
10     A.  I can't personally say.
11     Q.  Okay.  And do you know of
12 anyone at all in this universe who ever
13 had problems at all with this bathroom
14 that you've been describing?
15     A.  I don't know of anyone
16 personally.
17     Q.  Okay.  And with regard to
18 other bathrooms that you didn't go in
19 that your son might have went in or
20 your companion might have went in, do
21 you know of anyone else out there in
22 the world who ever had any problems with
23 those bathrooms?
24     A.  No, but I'm certainly not
25 the only human being in a wheelchair

Page 60

1  so...
2      Q.  I understand that.  I'm just
3  asking you don't know anybody else?
4      A.  No.
5      Q.  Okay.  Now, was there
6  anything else that was deficient or in
7  violation with respect to the bathroom
8  that you were in, ma'am?
9      A.  Not that I can remember.
10     Q.  Okay.  And you never went in
11 the bathrooms that David or your son
12 went into, right?
13     A.  No.
14     Q.  So you can't tell me from
15 your own personal experience what, if
16 any, violations or deficiencies there
17 were in those, correct?
18     A.  No, but David is learning a
19 lot about ADA.
20     Q.  Well, I'm not asking what
21 David might be able to talk about or
22 not.  But as far as you go, you never
23 set foot in those bathrooms, so you have
24 no personal knowledge of any
25 deficiencies or violations in those

Page 61

1  bathrooms, correct?
2      A.  I did not go into the men's
3  room, that's correct.
4      Q.  Okay.  So you don't have any
5  knowledge of any violations or alleged
6  violations in those bathrooms, correct?
7      A.  Beyond the photos.
8      Q.  Okay.  Now, you've told me
9  now everything that was deficient with
10 respect to the bathroom you were in,
11 right?
12     A.  To the best of my memory.
13     Q.  Now, what is the next area
14 of these facilities that you have any
15 problem with?  We've covered the parking
16 lot.  We covered the bathroom.  What
17 else?
18     A.  I'm trying to remember what
19 were other issues.  I recall that there
20 were lots of exterior issues.  I'm so
21 used to interior issues that it's hard
22 to separate one from the next.  The
23 bathroom I used -- I had specific issues
24 with.  I really can't remember.
25     Q.  So I just want to be clear.

16 (Pages 58 to 61)

Page 62

1  This is your deposition. You're a
2  plaintiff in this case, alleging that
3  this facility was somehow in violation
4  of the ADA.
5      Is there any other violations,
6  ma'am, that you could speak to today
7  while you're under oath in support of
8  your case?
9      A. I can't remember.
10     Q. None at all, correct?
11     A. I can't remember.
12     Q. Okay. And after -- did you
13  use the bathroom right away when you got
14  there or did you shop at first?
15     A. I think we shopped for a few
16  minutes. I can't -- I don't remember
17  walking in there in urgent need of a
18  bathroom.
19     Q. I'm sorry, I couldn't hear
20  that last part.
21     A. I do not remember having
22  urgent need for the bathroom when I
23  walked in, so we probably shopped for a
24  bit before I used the bathroom.
25     Q. Okay. Ma'am, what store did

Page 63

1  you first go to? You said you parked
2  the car. We talked about that. We
3  talked about you walking the 10 to 50
4  feet to an entrance. We talked about
5  you going inside but where did you first
6  go, ma'am?
7      A. I went to Dominic's.
8      Q. Okay. The grocery store,
9  right?
10     A. Correct.
11     Q. And how long did you spend
12  in there?
13     A. 15 minutes.
14     Q. Was that just by yourself or
15  with David and your son?
16     A. With David.
17     Q. And your son was in Best Buy
18  while you were in Dominic's?
19     A. Yes.
20     Q. Okay. You never set foot in
21  Best Buy, correct?
22     A. Correct.
23     Q. And Dominic's, you just spent
24  some time in gathering some food items
25  and then you checked out and then left?

Page 64

1      A. Yes.
2      Q. And there's no problems that
3  you saw in Dominic's, right?
4      A. Well, there's -- I can't
5  even -- there's problems everywhere but
6  no, there was nothing --
7      Q. Okay.
8      A. -- that jumped out at me,
9  no.
10     Q. And after you left Dominic's,
11  you went where within these facilities?
12     A. We went to Walgreens.
13     Q. Okay. And how did you get
14  from the Dominic's to the Walgreens, did
15  you have to walk outside?
16     A. I don't think so.
17     Q. So you think there's a
18  connective between the Dominic's and the
19  Walgreens inside?
20     A. I can't remember for sure.
21     Q. So you don't know if there
22  is or there isn't?
23     A. Right.
24     Q. And you don't know if you
25  went outside the Walgreens to get to the

Page 65

1  Dominic's or strike that.
2      You don't know if you went
3  outside the Dominic's to get to the
4  Walgreens, correct?
5      A. I'm trying to remember. It
6  was a very hot day; that's all I do
7  remember.
8      Q. But you don't know if you
9  had to do that?
10     A. No.
11     Q. And when you went to this
12  Walgreens, what was your purpose in
13  going there?
14     A. Altoids, I think.
15     Q. Okay. For you or for David?
16     A. Me.
17     Q. And how many minutes did you
18  spend in the Walgreens?
19     A. Not very long.
20     Q. Less than five minutes?
21     A. No, more than five.
22  Probably less than ten minutes.
23     Q. And all you purchased was
24  the Altoids?
25     A. Yes. Or something else.

17 (Pages 62 to 65)

Page 66

1  There was water maybe purchased there,
2  too.
3       Q. Anything else?
4       A. I don't think so.
5       Q. And you didn't notice any
6  problems or violations in the Walgreens,
7  did you, ma'am?
8       A. Well, counters are always an
9  issue.
10      Q. Now, but specifically in the
11 Walgreens, you can't recall anything in
12 particular that was an issue, can you?
13      A. No, because it's so perpetual
14 that I can't always remember.
15      Q. So there's no violations you
16 can delineate from each day with respect
17 to the Walgreens or the Dominic's,
18 right?
19      A. No.
20      Q. And then after you were in
21 the Walgreens, where did you go next?
22      A. I don't remember.
23      Q. Any idea at all, ma'am?
24      A. I Think I poked my head into
25 the Catherine's store.

Page 67

1       Q. With David?
2       A. Yeah. No, actually, David,
3  I think, went to see where Matthew was
4  and I rolled into the Catherine's.
5       Q. So you rolled your wheelchair
6  into the Catherine's from Walgreens?
7       A. Yeah.
8       Q. To get from the Walgreens to
9  the Catherine's, did you have to go
10 outside?
11      A. No. I mean, David pushed me
12 over to Catherine's and then I went into
13 the store.
14      Q. Okay. To get from the
15 Walgreens to the Catherine's, did you
16 have to go outside?
17      A. I don't think so. I think
18 they were connected.
19      Q. Okay. You think they were
20 connected in the interior?
21      A. Hm-hm.
22      Q. Is that yes?
23      A. Yes.
24      Q. Okay. And did you actually
25 go into the Catherine's?

Page 68

1       A. Yes.
2       Q. And by yourself?
3       A. Yes.
4       Q. Using your wheelchair?
5       A. Yes.
6       Q. How long did you spend in
7  there?
8       A. Five minutes. Less -- maybe
9  less than five minutes.
10      Q. What did you do?
11      A. Nothing. Just poked my head
12 around, looked around.
13      Q. It's a clothing store?
14      A. Yes.
15      Q. And you didn't notice any
16 problems or violations there, did you,
17 ma'am?
18      A. I didn't notice.
19      Q. And did you buy anything?
20      A. No.
21      Q. Where did you go next?
22      A. I think we left.
23      Q. That was the extent of your
24 entire visit there?
25      A. Yes.

Page 69

1       Q. And before you left the
2  Catherine's, did you do anything else
3  before you left?
4       A. I can't remember.
5       Q. Okay. So all you can recall
6  is leaving the Catherine's, going back
7  to the car, and leaving the facilities,
8  correct?
9       A. Yes.
10      Q. And you've described for me
11 with as much detail as you possibly can
12 give me everything that you did while
13 you were at these premises, correct?
14      A. As much as I can remember.
15      Q. There's nothing else
16 whatsoever you can recall, right, ma'am?
17      A. Nothing I can remember.
18      Q. And you didn't document in
19 any way the time that you spent there,
20 did you, ma'am?
21      A. No.
22      Q. You never put down in
23 writing a single word or notes or
24 anything about this visit, did you,
25 ma'am?

18 (Pages 66 to 69)

Page 70

1    A. Well, I journal, so I'm sure
2  there's a journal entry that includes
3  the visit to Town & Country.
4    Q. Okay. So you have a journal
5  that actually will tell us the dates
6  that you were in Chicago back in August
7  of 07, correct?
8    A. Yes, that is true.
9    Q. And that would tell us any
10 details that you wrote down at the time
11 about your visit to this facility,
12 right?
13   A. That is correct.
14   Q. Okay. And where is the
15 journal presently?
16   A. At my home.
17   Q. Did you look at that to
18 assist you in preparing to testify here
19 today?
20   A. No.
21   Q. Does your journal contain any
22 notes whatsoever about any deficiencies
23 or violations at these premises?
24   A. I'm sure I mentioned as
25 always that it's always a little

Page 71

1  appalling.
2    Q. That it's what?
3    A. Appalling.
4    Q. Okay. But you don't think
5  the journal contains any specifics --
6    A. No.
7    Q. -- about any of the alleged
8  violations --
9    A. No.
10   Q. -- correct?
11   A. I wouldn't write about that
12 in my journal.
13   Q. How long have you been
14 keeping this type of journal?
15   A. 15 years.
16   Q. Okay.
17   A. 16 years.
18   Q. And is it somewhere where
19 you'd note specific violations of --
20   A. No, no, it's not that. It's
21 not a work journal. It's a personal
22 journal.
23   Q. Okay. Just kind of get your
24 thoughts down and talk about your
25 feelings, those sorts of things?

Page 72

1    A. Yes.
2    Q. Okay. But with respect to
3  the pages that deal with your visit to
4  Chicago, you wouldn't have any
5  objection, based upon personal reasons
6  or anything to producing those pages,
7  would you?
8    A. I'd have to have a really
9  good reason to produce my personal
10 journal. What I would do is go back
11 and look for dates for you.
12   Q. Okay.
13   A. I'm not giving you my
14 journal.
15   Q. Apart from you possibly
16 mentioning in your journal that you went
17 to some stores with your son and your
18 companion, there's nothing in writing
19 whatsoever anywhere that memorializes
20 anything about your visit to these
21 premises, right?
22   A. Beyond photographs.
23   MR. BACON: I'm not going to
24 insert an objection here but if I could
25 interject, we do have a receipt.

Page 73

1    Q. Okay. You have a receipt
2  from being there, ma'am?
3    A. Yes.
4    Q. And what's the receipt --
5  from which store?
6    A. It was Walgreens.
7    Q. Okay. And is that in your
8  counsel's possession?
9    A. Yes.
10   Q. Do you have any other
11 receipts from the visit?
12   A. To the mall?
13   Q. Yeah. To the premises we're
14 talking about that are part of your
15 complaint in your lawsuit.
16   A. No.
17   Q. And counsel has that receipt?
18   A. I believe so.
19   MR. LEONARD: Okay. Counsel,
20 obviously, you will produce that?
21   MR. BACON: We'll produce it, if
22 you'd like. I'm digging through my file
23 right now. I can pull up -- I have a
24 copy of it. I can take a quick look
25 and read into the record and I'll be

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

Page 74

1  happy to give you a copy.
2        MR. LEONARD: Yeah, I'd
3  appreciate that. That would be great.
4        MR. BACON: If you'll give me
5  one minute here.
6        MR. LEONARD: Sure.
7        THE WITNESS: And it'll have a
8  date on it.
9        MR. BACON: Yeah, it has a date
10 on it. I have a copy of a Walgreens
11 receipt. Susie was the server. It's
12 dated August 4, 2007. The time is 2:58
13 p.m. The address is 235 East Palatine
14 Road in Arlington Heights. Palatine,
15 P A L A T I N E. And I actually can't
16 tell what it is that was purchased; it's
17 some coding.
18       A. Water.
19       MR. LEONARD: I appreciate your
20 reading that, Tom, and if you could just
21 maybe send that to me and fax a copy to
22 us.
23       MR. BACON: Absolutely.
24       Q. Ma'am, hearing your counsel
25 read that, does that refresh your

Page 75

1  recollection that that was the date you
2  were there?
3        A. Yeah.
4        Q. Okay. And you're not aware
5  of anything else, anything in writing,
6  anything written down by hand, any other
7  documents, notes, records whatsoever
8  that would relate in any way to your
9  visit to these premises, right?
10       A. No.
11       Q. Okay. Now, ma'am, when is
12 the first time that you told anybody
13 about this facility in Arlington
14 Heights?
15       A. I'm sure on my return from
16 Chicago.
17       Q. And who did you tell?
18       A. I probably told Dave Pedraza.
19       Q. Can you spell his last name
20 for the record?
21       A. P E D R A Z A.
22       Q. And before we ask about
23 that, you said this was sort of a
24 happenstance visit to this premises.
25 You have no intention to going back

Page 76

1  there, do you, ma'am?
2        A. I don't know.
3        Q. Well, you just went there by
4  chance, right?
5        A. Kind of, yes.
6        Q. You had no intention to go
7  there and you didn't know it existed,
8  right?
9        A. That is correct.
10       Q. You just happened to have a
11 need to buy something so you decided to
12 pull over and go there, right?
13       A. Yes.
14       Q. Okay. So some day if you
15 happen to be in that neighborhood and
16 you needed to buy something again, that
17 might cause you to go there, right?
18       A. Correct.
19       Q. But you have no present
20 intention to go there, do you?
21       A. No.
22       Q. And, in fact, your son lives
23 about 40 miles away from there, correct?
24       A. I think that's accurate.
25       Q. As you said, it seems like

Page 77

1  it was kind of out in the boonies,
2  right?
3        A. Yes.
4        Q. And you're not aware of
5  anyone that you know besides yourself
6  and your son and your companion who's
7  ever been there, right?
8        A. Correct.
9        Q. And you don't know anyone
10 who ever plans to go there, do you,
11 ma'am?
12       A. No.
13       Q. Okay. Now, you said you
14 contacted a David Pedraza to speak to
15 him, is that correct?
16       A. Yes.
17       Q. Did you do that by phone?
18       A. Yes.
19       Q. Who is David Pedraza?
20       A. He is an ADA expert.
21       Q. ADA expert?
22       A. Hm-hm.
23       Q. Is that yes?
24       A. Yes.
25       Q. Meaning he testifies in

20 (Pages 74 to 77)

Page 78

1  cases?
2      A. Well, yes. He testifies in
3  cases and he's an expert, so we talk
4  about all kinds of things that I see
5  out in the world, I bring them to him.
6      Q. Does he have disabilities
7  himself?
8      A. No.
9      Q. Okay. How long have you
10  known him?
11      A. Three or four years.
12      Q. How did you meet him?
13      A. I met him through a friend.
14  He met a friend. They started talking.
15  He talked about what he did, that he
16  was working on ADA stuff and she said I
17  have a friend in a chair and introduced
18  us.
19      Q. And who's your friend?
20      A. Tracy Greenberg.
21      Q. Where does Mr. Pedraza live
22  or have his business office?
23      A. In Florida.
24      Q. Have you ever met him in
25  person?

Page 79

1      A. Many times.
2      Q. Okay. And so your friend
3  happened to mention to him that you're
4  someone who's impacted by the ADA and
5  that caused what, you called Pedraza or
6  him to call you?
7      A. He called me.
8      Q. And that was three or four
9  years ago?
10      A. Yes.
11      Q. And what did he say when he
12  called you?
13      A. He just wanted to know what
14  I was doing in the way of advocacy, if
15  I had interest in that.
16      Q. And had you done any
17  advocacy, prior to talking to Pedraza?
18      A. Yeah, I had done a lot of
19  complaining.
20      Q. Meaning, like if you went to
21  a facility or store making a complaint
22  to them?
23      A. Absolutely.
24      Q. Any other type of advocacy
25  before you ran into or encountered

Page 80

1  Pedraza?
2      A. No.
3      Q. And is Pedraza someone who's
4  affiliated with Mr. Bacon's law office?
5      A. Not that I'm aware of.
6      Q. And how does Mr. Pedraza
7  earn his living?
8      A. He is an ADA expert.
9      Q. Meaning, he testifies in
10  cases for plaintiffs?
11      A. He also has many other
12  business interests.
13      Q. What are those?
14      A. Construction.
15      Q. I'm sorry, what?
16      A. Construction.
17      Q. Okay.
18      A. He's a contractor, a general
19  contractor.
20      Q. What's his address?
21      A. I don't know.
22      Q. What town does he live in?
23      A. A city outside of Miami.
24      Q. What city is that?
25      A. I don't know.

Page 81

1      Q. What's his phone number?
2      A. If you hold a minute, I can
3  tell you.
4      Q. Okay.
5      A. Are you ready?
6      Q. Yes.
7      A. It's 954.
8      Q. Okay.
9      A. 295.
10      Q. Okay.
11      A. 5933.
12      Q. Okay. And has Mr. Pedraza
13  served as an expert witness in some of
14  the cases in which you've been a
15  plaintiff?
16      A. Yes.
17      Q. All of them?
18      A. I'm not sure.
19      Q. Who pays him?
20      A. The defendants, as I believe
21  -- it depends on who wins the case.
22      Q. Excuse me?
23      A. I think it depends on who
24  wins the case.
25      Q. So he's not paid on an

21 (Pages 78 to 81)