# EXHIBIT

# 2

# PART II

DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION TO COMPEL ANSWERS
TO INTERROGATORIES, RESPONSES TO
REQUESTS FOR PRODUCTION AND TO
COMPEL SUBMISSION TO R.34 INSPECTION

Page 82

1  hourly basis. He only gets paid if you
2  win the case and attorneys' fees are
3  awarded?
4      A.  You want to know what, I
5  don't --
6      MR. BACON:  Objection.
7      A.  -- I don't know.
8      MR. BACON:  Ms. Kramer is not
9  qualified to answer that.
10     A.  I don't know.
11     MR. LEONARD:  She can give her
12 personal knowledge.
13     Q.  Ma'am, what's your
14 understanding of how that works?
15     A.  I don't know.
16     Q.  Okay.  So you've never paid
17 him any money?
18     A.  Never.
19     Q.  And he's never asked you pay
20 him anything?
21     A.  Never.
22     Q.  Even in all the cases he
23 served as an expert, you've never paid
24 him a dime?
25     A.  Not a dime.

Page 83

1      Q.  And you've never seen a bill
2  for him, correct?
3      A.  Never.
4      Q.  Okay.  Does Disabled
5  Patriots, does that organization ever
6  pay him?
7      A.  I don't think so.
8      Q.  So he works on a contingency
9  basis?
10     A.  Yes.
11     MR. BACON:  Objection.
12     Q.  Meaning, if the plaintiff
13 wins, he gets paid?
14     A.  See, you know what, I don't
15 -- I'm talking about stuff I don't even
16 really know about.  I don't know how
17 that works.
18     Q.  Okay.  Have you retained him
19 in this case, ma'am?
20     A.  I have not retained him, no.
21     Q.  Has anybody?
22     A.  I don't know.
23     Q.  Have you retained any experts
24 with respect to this case?
25     A.  No.

Page 84

1      Q.  Has anybody?
2      A.  I don't know.
3      Q.  To your knowledge, has
4  anybody on behalf of you or on behalf
5  of Disabled Patriots ever been to the
6  premises described in this complaint?
7      A.  Beyond me?
8      Q.  Yes.
9      A.  Somebody generally goes out
10 to look and see what the complaint --
11 what my complaints are and if it's
12 valid.
13     Q.  Well, ma'am, I'm not asking
14 what generally happens.  In this
15 lawsuit, has anyone gone to these
16 facilities to look at them?
17     A.  I don't know.
18     Q.  You have no knowledge of
19 that ever happening, do you, ma'am?
20     A.  None.
21     Q.  Okay.  And you certainly
22 haven't asked anyone to do that?
23     A.  I have not.
24     Q.  You haven't told anybody to
25 do that?

Page 85

1      A.  No.
2      Q.  And to your knowledge that
3  hasn't happened?
4      A.  Correct.
5      Q.  Okay.  And you have not
6  prepared any reports about these
7  facilities or any preliminary reports,
8  have you?
9      A.  No, beyond the photos that
10 we took.
11     Q.  Correct.  And you're not
12 aware of anyone doing any sort of
13 preliminary report or preliminary
14 assessment, with respect to these
15 premises, are you, ma'am?
16     A.  No.
17     Q.  Okay.  Well, in your
18 complaint that you filed in federal
19 court, ma'am, you make reference to some
20 sort of preliminary assessment or
21 preliminary report.  You're not aware of
22 that ever happening, are you, ma'am?
23     A.  I don't know what the
24 procedures are.
25     Q.  Well, you're the plaintiff in

22 (Pages 82 to 85)

Page 86

1   this case and in your complaint you make
2   reference to some kind of preliminary
3   assessment or preliminary report but you
4   have no idea what that means, do you?
5       A. Not really.
6       Q. Because you're not aware of
7   that ever happening, right?
8       A. I don't have anything to do
9   with that.
10      Q. Okay. Now, your recollection
11  is you contacted Pedraza sometime after
12  August of 07, right?
13      A. Correct, or we may have been
14  talking about another issue at the time.
15      Q. Would your journal tell us
16  when you talked to Pedraza for the first
17  time about these premises that are the
18  subject of your lawsuit?
19      A. I doubt that I would include
20  a journal entry about talking to Dave
21  Pedraza on the phone.
22      Q. You were also exchanging
23  e-mails with Pedraza?
24      A. Rarely.
25      Q. Sometimes?

Page 87

1       A. Occasionally.
2       Q. What is your e-mail address?
3       A. B O N I T A 1947 at Adelphia
4   dot net.
5       Q. And how long have you had
6   that e-mail address?
7       A. Since I moved to -- back to
8   Cleveland Heights from Avon Lake.
9       Q. When was that?
10      A. It'll be two years in March.
11      Q. What was your prior e-mail
12  address?
13      A. B O N I T A 1947 at Comcast
14  dot net.
15      Q. And how long did you have
16  that e-mail?
17      A. Two years.
18      Q. Okay. Did you know what
19  your e-mail before that was?
20      A. It's always B O N I T A 1947
21  and they've been different internet
22  providers.
23      Q. What are some of the other
24  providers besides Adelphia and Comcast?
25      A. AOL.

Page 88

1       Q. Now, when you spoke to
2   Pedraza whenever this was and you don't
3   recall when it was, right?
4       A. No.
5       Q. And you don't recall whether
6   it was over the phone or by e-mail?
7       A. No, I'm sure it was a phone
8   conversation.
9       Q. Okay. Do you have any idea
10  what you said to Pedraza on that
11  occasion and what he said to you?
12      A. Well, I think he asked me
13  how my trip to Chicago was and I talked
14  about my -- time that I spent with
15  my son.
16      Q. Okay. Do you say anything
17  else to him?
18      A. Yeah, that I mean, Chicago
19  was really, really inaccessible and it
20  just felt like a gigantic obstacle
21  course, which is what going around the
22  world is in general, but Chicago was
23  worse than Cleveland. That was my
24  observation.
25      Q. Did you tell Pedraza anything

Page 89

1   about the premises that we've been
2   talking about that are the subject of
3   your lawsuit?
4       A. I said that we had been to a
5   variety of places, shopping areas, malls
6   that we had been to.
7       Q. But you didn't identify for
8   him this one, did you?
9       A. I'm not sure if I did or
10  not.
11      Q. Okay. You don't have any
12  recollection of doing so?
13      A. No.
14      Q. And then did Pedraza ever do
15  anything with respect to these
16  facilities?
17      Did he ever look into them?
18  Explain about --
19      A. He might have and I can't
20  tell you if he did or not. I assume he
21  did.
22      Q. But if he did, it wouldn't
23  be because of you because you have no
24  idea what the address was when you
25  talked to him, right?

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

Page 90

1      A.  Well, I knew what the name
2  of the place was.
3      Q.  What did you think it was
4  called?
5      A.  Town & Country Mall.
6      Q.  Okay.  And did you identify
7  the mall for him?
8      A.  I told him that it was in
9  Arlington Heights, I think.
10      Q.  And did you tell him what it
11  was called?
12      A.  Yeah, I think I said that we
13  went to a Town & Country Mall.
14      Q.  And what did you tell him
15  about Town & Country Mall?
16      A.  That there were a million
17  things wrong.
18      Q.  Did you tell him anything
19  more specific then that?
20      A.  No.
21      Q.  And were you telling him so
22  that he would go out there and look at
23  it?
24      A.  Maybe on his next visit to
25  Chicago.

Page 91

1      Q.  Has he been to Chicago or
2  the Chicago area since you talked to him
3  back in August of 07?
4      A.  I think he's been there a
5  couple of times.
6      Q.  Has he ever been to the Town
7  & County Mall to your knowledge?
8      A.  I don't know but if he has
9  written a report, he has absolutely been
10  there.
11      Q.  But he's never told you
12  about being there?
13      A.  No.
14      Q.  And you're not aware of any
15  report he's ever put together about
16  these premises, are you?
17      A.  No, but I'm saying that we
18  don't enter into these lawsuits
19  frivolously.
20      Q.  Okay.  Well, I'm trying to
21  understand what went on here.  So you
22  talked to him.  You mentioned this mall
23  to him and then at some point in time
24  you filed this lawsuit, right?
25      A.  Right.

Page 92

1      Q.  But before you filed the
2  lawsuit, you have no knowledge that he's
3  ever been there, right?
4      A.  I am very -- I'm learning
5  more daily about what the ADA
6  specifications are.  And I do a lot of
7  lawsuits, as I'm sure you're aware of.
8  What I'm saying to you is, I'm not
9  exactly sure what the order of things
10  are but I do know that an expert goes
11  out to make sure that what I'm saying
12  is actual.  That they're actual
13  violations.
14      Q.  That's what you think
15  supposed to happen, right?
16      A.  I know that's what happens.
17      Q.  Well, I'm talking about this
18  case.  I'm not talking about in general,
19  ma'am.
20      A.  Okay.
21      Q.  In this case, before you
22  went to federal court and filed a
23  lawsuit, you have no knowledge
24  whatsoever that anybody ever went to
25  Town & Country and looked at these

Page 93

1  alleged violations, right?
2      A.  I know that Dave Pedraza
3  must have taken a look at the property.
4      Q.  Oh, so he did go there?
5      A.  I think he did.
6      Q.  When did he go there?
7      A.  I don't know.
8      Q.  Did he tell you he went
9  there?
10      A.  I don't remember.
11      Q.  So you don't know if he told
12  you that or not?
13      A.  No.
14      Q.  Okay.  Well, did he ever
15  show you any sort of report?
16      A.  No.
17      Q.  Or assessment?
18      A.  No.
19      Q.  Or findings or anything about
20  this facility?
21      A.  I have never seen a report
22  on this property.
23      Q.  And he had never mentioned
24  this property to you again, has he?
25      A.  No.

24 (Pages 90 to 93)

Page 94

1    Q.  Okay.  So you talked to him
2  on this one occasion in August or
3  thereabouts.
4    A.  Right.
5    Q.  And you've never spoken to
6  him about this facility since, have you,
7  ma'am?
8    A.  I don't think we've ever
9  spoken about this property again ever.
10   Q.  You have not?
11   A.  Have not.
12   Q.  Okay.  And have you ever
13 spoken to anybody about this property
14 besides Mr. Pedraza the one time we
15 talked about?
16   A.  No, except for the attorneys.
17   Q.  Okay.  We'll get into that
18 in a minute.  But with respect to
19 Pedraza, have you told me to the best
20 of your recollection everything you can
21 remember telling him during your
22 telephone conversation?
23   A.  Yes.
24   Q.  Okay.  And that telephone
25 conversation was to discuss a variety of

Page 95

1  matters, right?
2    A.  Yes.
3    Q.  So the part about Town &
4  Country might have been 30 seconds or
5  less, is that right?
6    A.  Yes.
7    Q.  And you don't have any notes
8  about that conversation, do you?
9    A.  No.
10   Q.  Okay.  Now, so you spoke to
11 Pedraza.  Did you ever prior to today
12 speak to anybody else about this
13 facility other than when you prepared
14 for your deposition with Mr. Bacon
15 yesterday?
16   A.  No.
17   Q.  No, is that right?
18   A.  No.
19   Q.  Okay.  So the only one
20 you've ever talked to about this
21 facility was Pedraza for 30 seconds and
22 then Mr. Bacon yesterday, right?
23   A.  Yes.
24   Q.  Nobody else?
25   A.  No.

Page 96

1    Q.  Okay.  And you didn't
2  communicate in writing, by e-mail, memo,
3  letter, note or otherwise with anyone
4  about this facility prior to yesterday,
5  correct?
6    A.  No, that's correct.
7    Q.  And to your knowledge, nobody
8  on your behalf has ever been out to
9  Town & Country to do an inspection of
10 the premises, right?
11   A.  You're best asking Mr. Bacon
12 about that.
13   Q.  Well, no, you're the
14 plaintiff in the case.  I want to know
15 what you know.
16   A.  I'm telling you that there
17 is a procedure and it was followed and
18 I'm not sure exactly how it works.
19   Q.  Well, did someone go out to
20 Town & Country after August of 07 or
21 did they not?
22   A.  Yes, they did.
23   Q.  Who?
24   A.  I assume it was Dave
25 Pedraza.

Page 97

1    Q.  Well, you just told me you
2  didn't know if he's ever been there.
3    A.  I'm assuming that that's what
4  happens is --
5    Q.  Well, if he's been there, he
6  certainly never mentioned it to you,
7  right?
8    A.  We never talked about it.
9  There's an --
10   Q.  Is there anyone else you
11 suspect might have gone out there?
12   A.  No.
13   MR. BACON:  Objection.  Hasn't
14 this all been asked?
15   MR. LEONARD:  Excuse me?
16   MR. BACON:  It's been asked and
17 answered.
18   MR. LEONARD:  I'm just trying to
19 get clear on some of this, counsel.
20   Q.  Ma'am, have you ever seen
21 any of the expert disclosures made by
22 your attorneys in this case?
23   A.  In this case, no.
24   Q.  Okay.  And you never asked
25 to?

25 (Pages 94 to 97)

Page 98

1    A. No.
2    Q. And they never told you?
3    A. No.
4    Q. So you don't know who your
5  experts are in this case?
6    A. I'm assuming -- Mr. Pedraza's
7  the person I've worked with.
8    Q. Anybody else who you think
9  might be your expert in this case?
10    A. No.
11    Q. Okay. How is Mr. Pedraza
12  being paid, with regard to this case?
13    A. I don't know.
14    Q. You don't have any agreement
15  with him, do you?
16    A. No.
17    Q. Does he have an agreement
18  with anybody?
19    A. I don't know.
20    Q. So if you happen to recover
21  attorneys' fees or costs, that's how you
22  think Pedraza will get paid?
23    A. I don't know.
24    MR. BACON: Objection. Asked and
25  answered. Mrs. Kramer does not know.

Page 99

1    Q. Well, ma'am, in your other
2  cases you brought where you've included
3  Pedraza as an expert, you've never paid
4  him, right?
5    A. Never.
6    Q. To your understanding, the
7  way he's gotten paid in those other
8  cases is if his attorney -- if you
9  prevail either by settlement or by a
10  judgment, then he gets money out of the
11  attorneys' fees and costs, right?
12    A. That's how I understand it.
13    Q. You've never ever had any
14  agreement with him, is that right?
15    A. Never.
16    Q. Okay. Does Pedraza have an
17  agreement with Mr. Bacon's office to
18  your knowledge?
19    A. I have no idea.
20    Q. Okay. You have no idea
21  about that, right?
22    A. None.
23    Q. Ma'am, when did you become a
24  member of an organization called
25  Disabled Patriots?

Page 100

1    A. Three years ago.
2    Q. And before we get to that,
3  what's Pedraza's e-mail?
4    A. I don't know.
5    Q. You have that available,
6  though, right?
7    A. Yes.
8    Q. Three years ago, how did you
9  become a member of Disabled Patriots?
10    A. Again, through talking to --
11  in the conversation with Dave.
12    Q. Mr. Pedraza?
13    A. Yes, he told me about this
14  organization out of Southern Florida.
15    Q. Okay. So the first time
16  that your friend kind of put you guys
17  together a few years ago, Pedraza is the
18  one that brings it up, right?
19    A. Yes.
20    Q. And what did he tell you at
21  the time about the organization?
22    A. He said that it was a little
23  grassroots organization that was doing a
24  lot of advocacy.
25    Q. Did he tell you anything

Page 101

1  else about it?
2    A. No.
3    Q. When did you join it?
4    A. At that time.
5    Q. How?
6    A. I signed an application.
7    Q. Who gave you the application?
8    A. I think he gave it to me and
9  I mailed it to an address in Florida.
10    Q. To whose office?
11    A. It was to an ADA access team
12  office address or it might have been
13  Disabled Patriots address.
14    Q. What is ADA access team? Is
15  that a different organization?
16    A. It's -- I don't -- it's part
17  of the monitoring stuff. It might be
18  an organization that Dave runs or works
19  with.
20    Q. Well, let me get this
21  straight. You talked to Pedraza?
22    A. Yeah.
23    Q. And he tells you about this
24  little grassroots organization called
25  Disabled -- was it called Disabled

26 (Pages 98 to 101)

Page 102

1    Patriots at the time?
2           A.  Yes.
3           Q.  Okay.  And he sent you an
4    application?
5           A.  Yes.
6           Q.  And then do you send it back
7    to him or do you send it back to
8    Disabled Patriots?
9           A.  I don't think I sent it back
10   to him.  I think I mailed it someplace.
11          Q.  At the time, was he like an
12   employee, agent of Disabled Patriots --
13          A.  No.
14          Q.  -- anything like that?
15          A.  No, he wasn't.  He was just
16   aware of them.
17          Q.  Okay.  And what did you do
18   to have to become a member?  Just fill
19   out a card?
20          A.  Nothing.  Just to fill out
21   an application.  It basically just
22   talked about how long I had been
23   disabled.
24          Q.  Okay.
25          A.  The nature of my disability

Page 103

1    but people are welcome to join who are
2    not disabled.
3           Q.  Okay.  So you don't have to
4    be disabled to be a member of Disabled
5    Patriots?
6           A.  That is correct.
7           Q.  Has Pedraza ever been an
8    employee, agent, representative,
9    anything with regard to Disabled
10   Patriots?
11          A.  Never.
12          Q.  Okay.  Is he a member?
13          A.  I would guess but I don't
14   know that for sure.
15          Q.  And so you didn't have to
16   pay any money to join?
17          A.  No.
18          Q.  You just submit this piece
19   of paper, right?
20          A.  Yes.
21          Q.  And then did someone send
22   you something back to say you've been
23   accepted as a member?
24          A.  No, but I spoke with Maria
25   Gallagher who is the president.

Page 104

1           Q.  When?
2           A.  It was not long after I
3    joined the organization.
4           Q.  Let me just get this
5    straight.  You submit this piece of
6    paper through the mail?
7           A.  Right.
8           Q.  And your assumption is that
9    you're now a member?
10          A.  Yes.
11          Q.  But they don't send you
12   anything back a certificate, a card,
13   anything to say you're now a member?
14          A.  That is correct.
15          Q.  And you've never received
16   anything like that from them?
17          A.  That is correct.
18          Q.  How do you know you're
19   really a member?
20          A.  Because there's 20 of us and
21   we talk about it.  And we had a meeting
22   in Pittsburgh this summer and talked
23   about it there.
24          Q.  Okay.  And so there's only
25   20 members of the organization?

Page 105

1           A.  Yes.
2           Q.  Okay.
3           A.  Might not even be 20.  I
4    don't know exactly the number.
5           Q.  Okay.  And Disabled Patriots,
6    where do they get the money from, their
7    organization?
8           A.  They get their money through
9    inspection fees or reinspection fees on
10   properties, after somebody has -- when a
11   -- when a place has been found to be
12   out of compliance with the ADA and they
13   either settle or whatever the
14   arrangement, is the attorneys have the
15   option to go back and re -- and see
16   that the fixes have been made.  And
17   when they do that, there's a fee
18   involved and they kick that into the
19   Disabled Patriots coffers.
20          Q.  Okay.  Now, when you joined
21   the organization or you thought you
22   joined it a few years ago --
23          A.  Yes.
24          Q.  -- how many members were
25   there at the time?

27 (Pages 102 to 105)

Page 106

1    A. Ten maybe.
2    Q. Okay. And are those ten
3  people still members.
4    A. I think so.
5    Q. Okay. And can I go to a web
6  site or anything like that to figure out
7  anything about the organization?
8    A. No, but it's coming.
9    Q. There is no web site?
10    A. Right.
11    Q. There's never been?
12    A. No.
13    Q. And it doesn't have any
14  newsletter?
15    A. No.
16    Q. And it's never had a
17  newsletter?
18    A. No, but those are all things
19  that are in the works.
20    Q. Okay. And is there any list
21  anywhere in the world I can get of its
22  membership?
23    A. Yes, I'm sure there is a
24  list and I'm not, you know --
25    Q. But you've never seen one?

Page 107

1    A. I've heard the names
2  mentioned but I have never -- I've never
3  seen the list, no.
4    Q. Okay. So you've never seen
5  the list. You don't know whether one
6  exists?
7    A. Right.
8    Q. Okay. And how do you think
9  there's 18 or 19 other members? How do
10  you think those people exist?
11    A. Because I was sitting at a
12  meeting this past summer where the
13  applications were counted.
14    Q. Okay. Where did that
15  meeting take place?
16    A. In Pittsburgh last summer.
17    Q. And before your August visit
18  to Chicago?
19    A. No, it was after that. So
20  it might have been early in the autumn
21  or in the autumn.
22    Q. Where was the meeting held?
23    A. In a hotel in Pittsburgh --
24  outside of Pittsburgh, Pennsylvania.
25    Q. And who called the meeting?

Page 108

1    A. Maria Gallagher, who is the
2  president of this organization and I
3  wanted to get together and start mapping
4  out a plan by which we could grow this
5  origination.
6    Q. Maria Gallagher is the
7  president of Disabled Patriots?
8    A. Correct.
9    Q. How long has she held that
10  title?
11    A. From the beginning of
12  Disabled Patriots. I'm assuming it's
13  five or six years.
14    Q. Do you know when the
15  organization started?
16    A. No, I don't know the exact
17  date.
18    Q. Okay. Who made her
19  president? She just said she's
20  president?
21    A. Well, she started the
22  organization so...
23    Q. Is she disabled?
24    A. No, she's not but she was a
25  caretaker. That's how she got into

Page 109

1  this.
2    Q. Where does she live?
3    A. Southern Florida,
4  Philadelphia. She's living in
5  Philadelphia now, I think.
6    Q. And how does she earn her
7  money?
8    A. A variety of ways. Again,
9  she's been a caretaker most of her life.
10    Q. And does she get paid by
11  Disabled Patriots?
12    A. No, no, no. No one's
13  getting paid by Disabled Patriots at
14  this point.
15    Q. Okay. Does she get a cut of
16  settlements or judgments from lawsuit --
17    A. No, not at all. This is
18  really doing the work because we believe
19  in the work.
20    Q. Okay. And are there any
21  other officers of Disabled Patriots
22  besides Ms. Gallagher?
23    A. There are but I don't know
24  them.
25    Q. You have no idea who they

28 (Pages 106 to 109)

Page 110

1 are?
2     A. No.
3     Q. What other positions are
4 there beside president?
5     A. I'm --
6     MR. BACON: Brain, I don't mean
7 to interrupt but if I can interject for
8 the record, Ms. Kramer herself is an
9 officer and director of Disabled
10 Patriots.
11    A. Right.
12    MR. LEONARD: Counsel, I'm going
13 to object to you coaching your witness.
14 If you have an objection to make, fine
15 but you can't direct or provide
16 testimony to your witness. Okay. Our
17 rules don't allow it in the North
18 District of Illinois. I'm sure it's the
19 same down in Florida.
20    Q. Ma'am, what other positions
21 are there besides president within this
22 organization?
23    A. I'm a director and
24 vice-president.
25    Q. Okay. Why is it when I

Page 111

1 asked you before about the other
2 officers, you had no idea what I was
3 talking about? Now, as your attorney
4 says that you're a vice-president,
5 you're telling me you're a
6 vice-president?
7     A. I thought you were talking
8 about people other than me, sir.
9     Q. I said other than Maria
10 Gallagher.
11    A. Okay. I'm an officer.
12    Q. And how long have you been
13 an officer?
14    A. It was decided this past --
15 at this past meeting.
16    Q. At the Pittsburgh meeting?
17    A. Yes.
18    Q. Okay. How many people were
19 at the Pittsburgh meeting?
20    A. Five or six.
21    Q. Who was there?
22    A. I don't remember exactly who
23 was there.
24    Q. So it was you, Ms. Gallagher
25 and you have no idea who else was

Page 112

1 there?
2     A. It was mostly getting
3 together so that I could talk to Maria.
4     Q. Just so I'm clear, it was
5 you, Ms. Gallagher, and you can't
6 identify anybody else who was there?
7     A. Correct.
8     Q. Was anybody else there?
9     A. Yes.
10    Q. Are they members of the
11 organization?
12    A. I don't know.
13    Q. Was Mr. Bacon there?
14    A. No.
15    Q. Were any attorneys there?
16    A. No.
17    Q. Does Disabled Patriots have
18 an office?
19    A. There's -- they have a small
20 office right now in Southern Florida.
21    Q. What town?
22    A. I don't know.
23    Q. No idea?
24    A. Hm-hm.
25    Q. You have to say yes or no.

Page 113

1     A. No, if I have to reach Maria
2 Gallagher, I usually call her by phone.
3     Q. Well, how do you know they
4 have an office?
5     A. Because I know we have
6 discussed that.
7     Q. You've never been there,
8 right?
9     A. No, I have not.
10    Q. What town is it in?
11    A. I don't know.
12    Q. Who is physically present at
13 the office at any time?
14    A. There's a phone and an
15 answering machine.
16    Q. That's it?
17    A. Yep.
18    Q. Okay. And do you know what
19 the address location is?
20    A. I don't know the address
21 location.
22    Q. You're a vice-president and
23 director of the organization and you
24 have no idea where their office is
25 located?

29 (Pages 110 to 113)

Page 114

1    A. I don't have it on me. I
2  can find it out for you. I have it at
3  home.
4    Q. But there's no employees who
5  report there for business, right?
6    A. No, there are no employees.
7    Q. And, in fact, none of the
8  members of the organization live in this
9  town, right?
10    A. Maria Gallagher mostly -- has
11  only resided away from there for a brief
12  time this year and I think she's back
13  residing there again now.
14    Q. Okay. And there's no
15  business conducted in this office, is
16  there?
17    A. Not right now.
18    Q. And there never has been,
19  correct?
20    A. No, but there will be.
21    Q. How long has the organization
22  had this office?
23    A. I think a short time.
24    Q. Well, what does that mean, a
25  week?

Page 115

1    A. No, no, no, months.
2    Q. A couple months?
3    A. Yes.
4    Q. And how do they pay for the
5  office?
6    A. I don't know.
7    Q. You're the vice-president and
8  director, you don't know how your
9  organization pays for their office?
10    A. I'm telling you that there's
11  a small amount of income from
12  reinspections of properties and that is
13  all the monies that there are in this
14  organization. Although we do have the
15  status to accept donations and that was,
16  again, part of the reason for this
17  meeting in the fall to talk about fund-
18  raising for the organization.
19    Q. But the organization,
20  Disabled Patriots, has no employee?
21    A. Right.
22    Q. It has at least two
23  officers, you and Maria Gallagher?
24    A. Correct.
25    Q. Who are the other directors?

Page 116

1    A. You know what, I don't know.
2  I don't remember.
3    Q. Are there any other
4  directors?
5    A. I don't remember.
6    Q. And how did you become a
7  director and vice-president? Maria
8  Gallagher said you're going to be a
9  director and vice-president?
10    A. No, no, no, but I've been
11  active in this organization, in terms of
12  doing a lot of work.
13    Q. Well, I understand that.
14  But before July or August of 2007, you
15  weren't a director and vice-president,
16  right?
17    A. That is correct.
18    Q. And when you went to this
19  meeting with you and Maria Gallagher
20  present, who said that Ms. Kramer's now
21  a director and vice-president?
22    A. She asked me would I like to
23  and I said yes.
24    Q. Ms. Gallagher did?
25    A. Yes.

Page 117

1    Q. So that's how you became
2  that title?
3    A. Correct.
4    Q. Anybody else who holds a
5  title in this organization besides you
6  and Ms. Gallagher?
7    A. I believe that there are but
8  I can't give you names right now.
9    Q. Is the group or organization
10  Paralyzed Veterans, is it incorporated
11  anywhere?
12    A. Yes, it is.
13    Q. Where?
14    A. In Southern Florida.
15    Q. How long has it been
16  incorporated?
17    A. Several years.
18    Q. Okay. And the documents
19  that show it's incorporated, those types
20  of things?
21    A. Hm-hm.
22    Q. Where are those documents
23  maintained?
24    A. In Southern Florida.
25    Q. At this office?

30 (Pages 114 to 117)

Page 118

1    A. Yes, I'm sure.
2    Q. You don't know, do you?
3    A. No, I'm fairly certain that
4  they are maintained there.
5    Q. Has it ever been incorporated
6  anywhere else besides Florida?
7    A. I'm not certain.
8    Q. Is it in good standing to
9  conduct business in the State of
10  Florida?
11    A. Yes, it is.
12    Q. How do you know that?
13    A. Because I know it for a fact
14  we had a meeting not very long ago, a
15  teleconference, which was a -- for the
16  purposes of maintaining the legal status
17  in Southern Florida.
18    Q. I don't understand. You had
19  a meeting to discuss whether you're
20  going to maintain legal status?
21    A. No, no, no, no, no. It was
22  a meeting to comply with what was
23  requested by the articles of
24  incorporation.
25    Q. There are articles of

Page 119

1  incorporation?
2    A. Yes.
3    Q. Is that yes?
4    A. Yes.
5    Q. And where are those
6  maintained?
7    A. I'm sure with Mrs. Gallagher.
8    Q. Is there like a corporate
9  minute book, anything like that?
10    A. I'm sure there are minutes
11  of this last meeting or these meetings.
12    Q. Well, do you know if there
13  really are?
14    A. Yes, I'm sure --
15    Q. Have you seen them?
16    A. I saw her taking notes. I'm
17  sure there are minutes.
18    Q. No, I'm not asking -- just
19  have you ever seen minutes from any of
20  the meetings?
21    A. I have not.
22    Q. Okay. So you're thinking
23  that they exist is because you saw
24  someone writing?
25    A. Correct.

Page 120

1    Q. So you think there's by-laws
2  but you've never seen them, right?
3    A. Yes.
4    Q. And you think they're
5  incorporated but you've never seen those
6  papers?
7    A. Correct.
8    Q. Okay. And the organization
9  has at least two officers, you and
10  Gallagher, right?
11    A. Correct.
12    Q. It has no employees?
13    A. Correct.
14    Q. And the only money it takes
15  in is if it's involved in a lawsuit or
16  a settlement and the monies from that?
17    A. Correct.
18    Q. And who decides what
19  percentage of those monies the
20  organization gets versus the attorneys,
21  like Mr. Bacon or somebody else gets?
22    A. Well, the attorneys get paid
23  whatever the agreement is.
24    Q. The agreement between who?
25    A. Between the defendants and

Page 121

1  the attorneys.
2    Q. So if the Disabled Patriots
3  has no say --
4    A. They work that out. No.
5    Q. -- how much the money goes
6  to the attorneys --
7    A. No.
8    Q. -- versus goes to them?
9    A. No. No.
10    Q. Excuse me?
11    A. No.
12    Q. Well, then how is that you
13  get money? It's just if Mr. Bacon
14  hypothetically decides that the
15  organization can get $1,000 out of the
16  settlement, then that's what you get?
17    A. It is not so random. I
18  think it has to do with reinspections of
19  properties that have already been cited
20  and have gone through a legal process.
21    Q. Is Mr. Bacon or the other
22  attorneys from Illinois, are they
23  members of Disabled Patriots?
24    A. I don't know. No, I'm
25  pretty sure they're not.

31 (Pages 118 to 121)

Page 122

1    Q. Does Disabled Patriots pay
2  them anything?
3    A. No. No, no, no, no.
4    Q. Do they pay Disabled Patriots
5  anything?
6    A. No.
7    Q. So the only one to get money
8  through these lawsuits but the attorneys
9  don't give any of the money to your
10  organization?
11    A. That is correct.
12    Q. Okay. So like in this suit
13  that we're involved in now?
14    A. Yes.
15    Q. If money is recovered, who
16  gets it?
17    A. If money is recovered, it's
18  up to the attorneys. The attorneys get
19  it.
20    Q. So you don't get anything?
21    A. No.
22    Q. You personally, the
23  organization, Disabled Patriots, would
24  get nothing?
25    A. Nothing.

Page 123

1    Q. Unless the attorneys decide
2  they wanted to give some money as a
3  gift?
4    A. Precisely.
5    Q. Okay. And there's no
6  agreement between Mr. Bacon's firm or
7  the other firm in Illinois and Disabled
8  Patriots, is there?
9    A. That is correct.
10    Q. And there's never an
11  agreement with Disabled Patriots and the
12  attorneys in any of these cases, right?
13    A. That is correct.
14    Q. Okay. And has Disabled
15  Patriots ever paid an attorney any
16  money?
17    A. Not to my awareness.
18    Q. Has Mr. Bacon or the lawyer
19  in Illinois ever given or paid any money
20  to your organization?
21    A. Not to my awareness.
22    Q. So all these suits you've
23  been involved in, they've never given a
24  nickel back to Disabled Patriots; is
25  that right?

Page 124

1    A. That is correct.
2    Q. And in all these cases
3  you've been involved in, has a
4  settlement agreement ever provided for
5  or the judgement ever provided for
6  Disabled Patriots to receive any money?
7    A. No.
8    Q. Okay.
9    A. Again, not to my awareness.
10    Q. Okay. And does Disabled
11  Patriots have any bank accounts?
12    A. I think they have a bank
13  account, yes.
14    Q. Where is it located?
15    A. In Southern Florida.
16    Q. You've never seen any
17  documents showing the bank account?
18    A. I have not.
19    Q. And why do you think they
20  have a bank account?
21    A. Because they do business,
22  some business. There's a phone bill
23  being paid.
24    Q. So you think the monies got
25  to come from somewhere?

Page 125

1    A. Right.
2    Q. Okay. Who would have access
3  to that account?
4    A. Maria Gallagher.
5    Q. Only her?
6    A. Yes. As the best of my
7  knowledge, yes.
8    Q. Okay. And does Disabled
9  Patriots besides -- well, strike that.
10    Does Disabled Patriots have any
11  assets at all?
12    A. Not beyond what I've
13  described which is reinspection fees on
14  properties.
15    Q. Well, according to you, it's
16  possible that they might have some money
17  in a bank account, right?
18    A. They might. Again, there
19  might have been some donations that I'm
20  not aware of.
21    Q. Okay. But you don't have
22  any knowledge that they have any assets
23  at all, do you, ma'am?
24    A. No.
25    Q. Okay. So as far as you're

32 (Pages 122 to 125)

Page 126

1  sitting here under oath today, you're
2  not aware of anything that Disabled
3  Patriots possesses or owns, correct?
4      A.  That is correct.
5      Q.  Does the organization even
6  own a cell phone or anything like that?
7      A.  They have a phone.  I know
8  they do.
9      Q.  Well, is it just a phone
10 that happens be in the office or is it
11 a cell phone?
12     A.  No, it's a phone in the
13 office.
14     Q.  So they don't own that,
15 that's just part of the rental
16 agreement?
17     A.  I don't know.
18     Q.  Okay.  Is there any
19 furniture, desk, anything at all in this
20 office space you've been talking about?
21     A.  Well, it's not an empty
22 space so -- and I can't tell what's in
23 the space.  I've never seen it.
24     Q.  You've never been there?
25     A.  Not yet.

Page 127

1      Q.  And no one's ever described
2  it to you?
3      A.  No.
4      Q.  Okay.  So I'm trying to
5  understand why Disabled Patriots is a
6  party to this case.  They have no
7  entitlement to any of the monies from
8  this case, they have no assets.  So
9  what is it they bring to this case?  I
10 don't understand.
11     A.  Well, again, this is a
12 little organization that is working on
13 making sure that the ADA is enforced.
14 That's the entire function.
15     Q.  That's why they're a party
16 to this case?
17     A.  That's right.
18     Q.  Well, why do we need them?
19 We have you who is the plaintiff.  Why
20 do we also need them?  I don't
21 understand what they add to the case.
22     A.  Talk to Mr. Bacon.  That's
23 stuff I don't know about.
24     Q.  Well, the attorneys could
25 tell me but you couldn't?

Page 128

1      A.  I can't -- I don't know.
2      Q.  Okay.  Who is it that
3  decided that Mr. Bacon and the attorney
4  in Illinois should be the lawyers for
5  Disabled Patriots in this case?
6      A.  I don't know.
7      Q.  You have no idea?
8      A.  Um-um.
9      Q.  Is that a no?
10     A.  No.  I know I've worked with
11 Mr. Bacon a few times and --
12     Q.  Well, ma'am, you're the
13 plaintiff in this case, you understand
14 that, right?
15     A.  Yes.
16     Q.  Okay.  And Mr. Bacon, he
17 doesn't represent you personally, does
18 he?
19     A.  No.
20     Q.  He just represents Disabled
21 Patriots?
22     A.  Yes, but he --
23     Q.  Who at Disabled Patriots
24 retained him and the guy in Illinois to
25 be their attorneys for this case?

Page 129

1      A.  I don't know how the
2  decisions are made.
3      Q.  So is it correct that what
4  happened was someone just sent you a
5  copy of this lawsuit after it was filed
6  and said that it had been filed?
7      A.  Well, no, because I sign off
8  before they're filed.
9      Q.  Okay.  So someone sent you
10 -- how did you know that Mr. Bacon was
11 even going to be involved in this thing?
12     A.  Perhaps through
13 conversations.
14     Q.  Well, I don't want a
15 perhaps.  I want to know -- this is a
16 very short time ago.
17     A.  Okay.
18     Q.  How did you find out that
19 Mr. Bacon was going to be an attorney
20 in this case?
21     A.  I know that we have worked
22 with Tom.  I've worked with Tom on
23 other cases and I know that he is one
24 of the attorneys that Disabled Patriots
25 works on with cases.

33 (Pages 126 to 129)

Page 130

1    Q. But you didn't have ask him
2 to file the suit, did you?
3    A. Personally, no.
4    Q. You didn't ask him to draft
5 a complaint, did you, ma'am?
6    A. Personally, no.
7    Q. Do you know who did?
8    A. I assume Disabled Patriots
9 which means Maria.
10    Q. But you don't know that?
11    A. I'm assuming.
12    Q. Okay. But you don't know
13 that for sure, do you?
14    A. No.
15    Q. Okay. And how would Maria
16 have known that a lawsuit should be put
17 together?
18    A. Because we talk about what
19 we're seeing out in the field all the
20 time.
21    Q. Okay. So you talked to
22 Maria about this incident in Illinois
23 when?
24    A. I'm sure when I returned.
25    Q. Okay. Do you remember

Page 131

1 talking to her about it?
2    A. Sure.
3    Q. What did you tell her?
4    A. I talked to her about the
5 fact that I saw numerous things on a
6 trip to Chicago all that were appalling.
7    Q. And you specifically told her
8 about Town & Country Mall?
9    A. I did.
10    Q. Okay. And then the next
11 thing that happened is, Mr. Bacon sent
12 you in the mail a copy of a complaint
13 to review; is that right?
14    A. Correct.
15    Q. So you go into Town &
16 Country, you talk to Pedraza once, you
17 never talk to him again, then you talk
18 to Maria about this Town & Country, and
19 you never talk to her about it again,
20 right?
21    A. Correct, I think --
22    Q. And then one day you get in
23 the mail at your house a copy of a
24 lawsuit that's in your name and in
25 Disabled Patriots' name, right?

Page 132

1    A. Yes.
2    Q. You didn't ask anyone to put
3 that together, did you?
4    A. I know that it was a list of
5 -- a list of places that we saw in
6 Chicago that were substandard.
7    Q. I understand that. But you
8 didn't ask anyone to draft a lawsuit,
9 did you?
10    A. No.
11    Q. Okay. So you get this in
12 the mail and it's sort of out of the
13 blue, right?
14    A. No, because I know we're
15 always working on cases.
16    Q. Well, yeah, you're not
17 surprised that someone sent you a
18 lawsuit but no one had told you you
19 were going to receive this, right?
20    A. No, this is what I do.
21    Q. Okay. And so then you
22 looked at the complaint. Did you review
23 it for accuracy?
24    A. Absolutely.
25    Q. And then you didn't make any

Page 133

1 changes, did you?
2    A. No.
3    Q. And it looks an awful lot
4 like a lot of the suits you filed,
5 right?
6    A. Correct.
7    Q. It actually has the exact
8 same language as almost all of the other
9 lawsuits, doesn't it?
10    A. Correct.
11    Q. And I don't understand, how
12 can the violations be the same in every
13 place? They're not, are they, ma'am?
14    A. No, they're definitely not.
15    Q. So why didn't you make
16 changes to more accurately reflect the
17 violations that you actually saw in
18 Illinois?
19    A. Because I don't think I was
20 being asked that at that time.
21    Q. Well, what did you think
22 your purpose was in reviewing this
23 complaint, ma'am?
24    A. Just to see if it was --
25 there was -- as best I can remember,

34 (Pages 130 to 133)

Page 134

1 there was nothing erroneous in the
2 report or the complaint.
3        Q. A lot of the things in the
4 complaint, ma'am, are things you never
5 saw at Town & Country, right?
6        A. I don't know what you're
7 talking about.
8        Q. Well, there's all sorts of
9 allegations in your complaint, and
10 there's things that you never personally
11 observed in Illinois, are they, ma'am?
12        A. Like what?
13        Q. Well, you just listed for
14 all me all the violations that you were
15 aware of, right?
16        A. Hm-hm.
17        Q. We went through that in
18 detail, didn't we?
19        A. I told you as best as I
20 could remember.
21        Q. Correct. But the thing that
22 was sent to you in the mail out of the
23 blue by Mr. Bacon's office it contained
24 a lot of other violations that you never
25 even saw, right?

Page 135

1        A. But what I'm telling you is
2 that if I find a lot of violations
3 personally, it's enough to get somebody
4 out there to take another look.
5        Q. Before you signed off on
6 this lawsuit going forward, you had no
7 idea that anyone had ever taken another
8 look, right?
9        A. I always know that someone's
10 taking another look. It's not --
11        Q. Well, who took another look
12 at this case and before you signed off
13 on the suit?
14        A. It's not on my 20
15 photographs that we decide to file a
16 lawsuit, sir.
17        Q. Well, ma'am, I'm asking you.
18 You're the plaintiff in this case. Who
19 went out there to your knowledge to
20 verify these things in the complaint
21 actually exist?
22        A. The expert, David Pedraza.
23        Q. So he was there?
24        A. Yes.
25        Q. Okay. When did he go there?

Page 136

1        A. I don't know.
2        Q. But you told me earlier that
3 he never told you he had ever been
4 there, right?
5        A. We never talked about it but
6 it's just in the cycle of how things
7 are done. I tell people what I see.
8 If Dave thinks that there's enough merit
9 on what I'm telling him, he goes out
10 and takes a look.
11        Q. I understand that's how it
12 usually works. But in this particular
13 suit, you had no knowledge that David
14 had ever actually been there because he
15 never told you he had been there, right?
16        A. That is correct but there's
17 no lawsuit without an expert taking a
18 look.
19        Q. Well, there shouldn't be.
20        A. Well, there isn't --
21        Q. You didn't know Pedraza had
22 been out there either --
23        A. There is no -- never a
24 lawsuit where there is not an expert
25 taking a look.

Page 137

1        Q. Ma'am, with regard to this
2 lawsuit we're here for today --
3        A. Okay.
4        Q. -- nobody ever told you that
5 Pedraza or anybody else had ever been
6 there before you signed off on them
7 suing this company, right?
8        A. I knew Dave looked at all
9 stuff in Chicago.
10        Q. Wait, wait, ma'am, I'm not
11 asking what you think might have
12 happened.
13        A. No, I'm telling you.
14        Q. Before you filed this
15 particular lawsuit, nobody ever told you
16 that Pedraza or anyone else had ever
17 been back to Town & Country, right?
18        A. I knew that Pedraza had gone
19 to the greater -- the Chicago land area
20 to look at all the things I mentioned.
21        Q. Listen to my specific
22 question.
23        A. Okay.
24        Q. Before you signed off on
25 this lawsuit going forward in your name,

35 (Pages 134 to 137)

Page 138

1  nobody ever told you specifically that
2  Pedraza had ever been or anyone else had
3  ever been to Town & Country, right?
4       A. Right.
5       Q. Okay. Now, in this suit,
6  ma'am, if you do prevail, do you get
7  anything from it yourself, other than
8  the satisfaction of knowing that things
9  might be corrected?
10      A. Nothing.
11      Q. You get nothing out of it,
12 right?
13      A. Nothing.
14      Q. You have no interest, right?
15      A. Nothing.
16      Q. And likewise, Disabled
17 Patriots, if you prevail, likewise other
18 than getting satisfaction, gets nothing
19 out of it either, right?
20      A. That is correct.
21      Q. Okay. Who were the other
22 members of Disabled Patriots besides
23 yourself and Ms. Gallagher?
24      A. I haven't met them but there
25 are people that work all over the East

Page 139

1  Coast.
2       Q. But can you identify for me,
3  ma'am, as the vice-president and
4  director of Disabled Patriots, the
5  identity of a single member besides
6  yourself and Ms. Gallagher?
7       A. There's a gentleman named
8  Marcus that lives in Alabama and he's --
9       Q. Marcus?
10      A. Marcus, and he's very active.
11      Q. What's his last name?
12      A. I don't know.
13      Q. Do you have any idea where
14 he lives?
15      A. Atlanta.
16      Q. Okay. Have you ever spoken
17 to him?
18      A. No.
19      Q. Is he disabled?
20      A. Yes.
21      Q. Okay. What's his disability?
22      A. I believe he's in a
23 wheelchair.
24      Q. Have you ever seen him?
25      A. No.

Page 140

1       Q. Okay. And we talked about
2  Maria Gallagher. Do you have her
3  address or contact information?
4       A. I have a phone number.
5       Q. What's that?
6       A. Hold on. Also, I'm going to
7  need a break to get some water and go
8  the bathroom. One second.
9       MR. BACON: Michael, what do you
10 want to do? Do you want to take a ten
11 minute break or something?
12      MR. LEONARD: Do you want to
13 take ten?
14      MR. BACON: How do you want to
15 do this, as far as the telephone calls
16 are concerned? Should we just leave the
17 lines open?
18      MR. LEONARD: Yeah, just leave it
19 open.
20      MR. BACON: Ten minutes.
21      (Recess taken.)
22      Q. Ready to proceed?
23      A. Yes.
24      Q. You understand you're back on
25 the record and under oath, ma'am?

Page 141

1       A. Yes.
2       Q. When we took a break --
3  first of all, you were going to get me
4  -- you did get me Maria Gallagher's
5  phone number, correct?
6       A. I have it right here.
7       Q. And what's that?
8       A. It is 561.
9       Q. Okay.
10      A. 452.
11      Q. Okay.
12      A. 4155.
13      Q. 4155?
14      A. Correct.
15      Q. Okay. We were talking about
16 the membership of Disabled Patriots and
17 we already talked about yourself, Ms.
18 Gallagher. How long has she been a
19 member?
20      A. From the beginning.
21      Q. You don't know of any
22 records that show how long she's been a
23 member, though, right?
24      A. Yeah, but I know that there
25 must be records.

36 (Pages 138 to 141)

Page 142

1    Q. You've never seen them?
2    A. No.
3    Q. This individual Marcus who
4  lives in Atlanta, you don't know his
5  last name?
6    A. I don't.
7    Q. And you don't know his phone
8  number?
9    A. No.
10   Q. And you don't know his
11 address?
12   A. I don't.
13   Q. And you've never met him?
14   A. No.
15   Q. Have you ever spoken to him?
16   A. No.
17   Q. And how do you know he's a
18 member?
19   A. Because I've been told and I
20 heard him referenced numerous times.
21   Q. Okay. And your understanding
22 is that he uses a wheelchair?
23   A. Yes, I know he does.
24   Q. You've never seen him use a
25 wheelchair, have you?

Page 143

1    A. No.
2    Q. And you know nothing about
3  his alleged disability, do you, ma'am?
4    A. I do not.
5    Q. Okay. Can you identify any
6  other members for me?
7    A. I can't.
8    Q. None?
9    A. I know that there are other
10 members. I'm just kind of drawing a
11 blank.
12   Q. Well, you're the
13 vice-president and a director of the
14 organization and you can't identify for
15 me a single additional member, correct?
16   A. Correct. I know -- I have a
17 friend here that's a member that's in a
18 wheelchair.
19   Q. Who's that?
20   A. His name is John Greiner.
21   Q. How do you spell the last
22 name?
23   A. G R E I N E R.
24   Q. Okay. And he lives in
25 Cleveland?

Page 144

1    A. He lives in Avon Lake, Ohio.
2    Q. Okay. What's his address?
3    A. I don't remember offhand.
4  It's on Lear Road in Avon Lake?
5    Q. How do you spell the name of
6  the road?
7    A. L E A R.
8    Q. And Avon Lake, and that's
9  outside of Cleveland?
10   A. It is. It's a suburb.
11   Q. Do you have his phone
12 number?
13   A. I don't.
14   Q. Do you have his e-mail
15 address?
16   A. At home.
17   Q. Do you have Marcus' phone
18 number or e-mail address at home?
19   A. I do not.
20   Q. Okay. Mr. Greiner, how long
21 have you known him?
22   A. Three or four years.
23   Q. How do you know he's a
24 member?
25   A. Because he filled out an

Page 145

1  application and I think it was in my
2  presence.
3    Q. Okay. And you say he uses a
4  wheelchair?
5    A. Yes.
6    Q. And how long has he used a
7  wheelchair?
8    A. He is now 28 years old.
9  He's used it since he was 16.
10   Q. I'm sorry, since he was 16?
11   A. Yes.
12   Q. What's the nature of his
13 disability?
14   A. He had an accident.
15   Q. Car accident?
16   A. No, a bike riding trick --
17 doing BMX bicycle trick riding.
18   Q. Okay.
19   A. And snapped his --
20   Q. Is he paralyzed?
21   A. Yes, he is.
22   Q. Okay. Any other members or
23 people who you think are members besides
24 Maria Gallagher, yourself, Marcus, John
25 Greiner?

37 (Pages 142 to 145)

Page 146

1    A. No, but I know there are
2  others.
3        Q. How do you know that?
4        A. Because we talked about them.
5  Their names were mentioned.
6        Q. When?
7        A. At this meeting in
8  Pittsburgh.
9        Q. So someone has told you over
10 the years that there might be as many
11 as 20 members but you can't identify any
12 of them?
13       A. I can't, yeah, except for --
14       Q. How would I find out their
15 identities --
16       A. You would ask --
17       Q. -- that they exist?
18       A. You would ask Maria
19 Gallagher.
20       Q. Okay. I'm sorry, I think
21 you already told me this and I
22 apologize, if I asked. John Greiner,
23 you know he's a member because you saw
24 him filling out an application?
25       A. Yes.

Page 147

1        Q. Do you know if he ever sent
2  it in?
3        A. I'm sure he did.
4        Q. You just don't know one way
5  or the other?
6        A. No, I'm pretty sure he did.
7        Q. You think that he would
8  have?
9        A. I think he did.
10       Q. Okay.
11       A. I think his name was
12 mentioned also at this meeting.
13       Q. Okay. The other people who
14 might be members, you don't know
15 anything about them?
16       A. No.
17       Q. And is there any way that
18 the group conducts business? For
19 instance, are there -- is there an
20 annual meeting? How does the group
21 conduct its business?
22       A. There was recently an annual
23 meeting, a teleconference.
24       Q. Has there ever been one
25 before?

Page 148

1        A. Not that I participated in.
2        Q. Well, was there ever one
3  before that you know of?
4        A. I don't know.
5        Q. Okay. And why was this
6  particular meeting called? You said
7  there was some concern about following
8  the corporate formalities. How did that
9  come to Disabled Patriots' attention?
10       A. I don't know. I just know
11 that there are policies and procedures
12 that are necessary to maintain our
13 incorporation status in good standing.
14       Q. Who were the participants in
15 this telephone conference?
16       A. Maria Gallagher and I'm
17 trying to recall who else was present.
18 Again, it was a teleconference.
19       Q. You don't know?
20       A. Um-um.
21       Q. Is that a no?
22       A. No.
23       Q. And you've never seen any
24 minutes from the meeting?
25       A. I have not.

Page 149

1        Q. Were you physically in the
2  same room as Maria Gallagher?
3        A. No, it was a teleconference.
4  We did it by phone.
5        Q. You said something earlier
6  about seeing her taking notes or
7  something. So you don't know whether
8  anyone took any notes?
9        A. No, no. No, I saw her
10 taking notes in Pittsburgh when we were
11 -- we had a physical meeting.
12       Q. This meeting that took place,
13 this telephone conversation, it was in
14 what month?
15       A. I'm sorry?
16       Q. The annual meeting that was
17 the telephone conference, when was that?
18       A. Yes, that was in the autumn,
19 also.
20       Q. Of 07?
21       A. Yes. No -- yes, the autumn
22 of 07, I believe, or it might --
23       Q. Would your journal or
24 something else tell us the date it took
25 place?

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

Page 150

1    A. Yes, probably it would give
2  a date.
3    Q. Okay.
4    A. Probably.
5    Q. And you don't know any
6  participants besides yourself and Maria?
7    A. No, I know that there were
8  some people that were there by proxy.
9    Q. Okay. What does that mean
10  by proxy?
11    A. That they had given
12  permission to Maria for voting purposes.
13    Q. Who was given permission?
14  What people?
15    A. Members that weren't present.
16    Q. Correct. But who are they?
17    A. I know one was -- Marcus was
18  not present at the teleconference.
19    Q. Anybody else?
20    A. I don't know. I know that
21  there were other people spoken of but I
22  can't remember names.
23    Q. Okay. And what votes were
24  taken at that meeting, the telephone
25  conference annual meeting?

Page 151

1    A. It was a teleconference and
2  I'm sure Maria took minutes of what was
3  transpiring.
4    Q. Do you have any notes about
5  that meeting?
6    A. I do not.
7    Q. But what was voted on? You
8  said there was votes taken.
9    A. Officers.
10    Q. Okay. That's when you
11  became elected?
12    A. That is correct.
13    Q. And how many people voted?
14    A. I'm not positive. I'm not
15  sure.
16    Q. And what other officers were
17  created at that meeting besides
18  yourself?
19    A. I don't know that anybody
20  else was created but I think someone was
21  removed.
22    Q. Someone were what?
23    A. Someone was removed.
24    Q. Who was that?
25    A. Someone whose name I don't

Page 152

1  remember.
2    Q. And why were they removed?
3    A. I don't know.
4    Q. There was no discussion as
5  to why they're going to be removed?
6    A. No.
7    Q. Any other votes taken other
8  than who's going to be the officers?
9    A. I don't believe so.
10    Q. Okay. Ma'am, with respect
11  to your own disability.
12    A. Yes.
13    Q. How long have you been
14  disabled?
15    A. I've been in a wheelchair it
16  will be seven years this spring.
17    Q. Okay. And I'm sorry, this
18  might be difficult but what were the
19  circumstances that led you to start
20  using a wheelchair?
21    A. I have multiple sclerosis and
22  getting around with the walker became
23  increasingly more difficult.
24    Q. Okay. And at some point in
25  time, you were not able to walk?

Page 153

1    A. That is correct.
2    Q. And when was that?
3    A. It'll be seven years in the
4  spring.
5    Q. Okay. And in terms of
6  treatment for that, are there anything
7  that you -- in terms of a drug regiment
8  or anything else?
9    A. No, I'm not. I've chosen
10  not to do a drug regiment.
11    Q. Okay. And is there someone
12  that you see, a doctor or anything like
13  that, for treatment?
14    A. Sure, I have a neurologist
15  and an internist both that oversee my
16  health care.
17    Q. Okay. And in addition to
18  the wheelchair, is there any other way,
19  you know, I guess, can you explain for
20  us, in other words, how it affects you?
21    A. I'm not sure what you're
22  asking. The wheelchair -- being in a
23  wheelchair affects every element of my
24  life.
25    Q. Oh, I understand that. That

39 (Pages 150 to 153)

Page 154

1  may be a dumb question, too broad.
2  Obviously, you're limited substantially
3  in terms of the wheelchair; and then,
4  therefore, that has implications for
5  many of the things you do, correct?
6      A.  Correct.
7      Q.  When did you last have
8  employment?
9      A.  Outside of my home I worked
10  in the wheelchair for -- selling AT&T
11  cell phones out of Best Buy after I
12  went into the wheelchair, as kind of a
13  test case.
14      Q.  What do you mean a test
15  case, to see if you could do it?
16      A.  I mean, I have not worked
17  outside of the home from that -- since
18  I had been disabled.  So I wanted to
19  see what I could do in the wheelchair.
20      Q.  I got you.  So you said your
21  disability began -- in terms of the
22  wheelchair began in what, about 2001?
23      A.  Yeah.
24      Q.  Okay.  Were you working
25  before 2001?

Page 155

1      A.  Sure.
2      Q.  In what capacity?
3      A.  I sold ads.  I was an ad
4  salesperson for the Free Times
5  Newspaper.
6      Q.  Is that in Cleveland?
7      A.  Yes, it is.  It's a local
8  alternative newspaper.
9      Q.  And how long did you have
10  the job for?
11      A.  Five years.
12      Q.  Okay.  And what about before
13  that?
14      A.  A variety of things but I
15  raised three children also, which is
16  what I considered my primary occupation.
17      Q.  Okay.
18      A.  I was a salesperson in a
19  variety of capacities.
20      Q.  And related to newspapers
21  or --
22      A.  Newspapers and I sold other
23  things, as well.  I worked for a -- I
24  ran an office for a singing telegram
25  company.  I did -- I worked in

Page 156

1  residential treatment of emotionally
2  disturbed kids.
3      Q.  What is your present age?
4      A.  60.
5      Q.  60?
6      A.  Yes.
7      Q.  And what's your present
8  address?
9      A.  2501 North Taylor Road,
10  Apartment 310, Cleveland Heights, Ohio,
11  44118.
12      Q.  And do you've lived there
13  about how long?
14      A.  Two years in March.
15      Q.  Okay.  Where did you live
16  before that?
17      A.  I lived in Avon Lake on Lear
18  Road.
19      Q.  Okay.  And you have three
20  children; they're all in their 20's or
21  above?
22      A.  Yes.
23      Q.  And do you have any sources
24  of income?
25      A.  Social Security Disability.

Page 157

1      Q.  And how long have you had
2  that?
3      A.  Since I became disabled.
4      Q.  So you went through the
5  process of application, all that, back
6  in the late 1990's, early 2000's?
7      A.  Correct.
8      Q.  Okay.  And you were awarded
9  disability, correct?
10      A.  I was.
11      Q.  Besides the SSI payments, do
12  you receive any other sources of income?
13      A.  No.
14      Q.  And how much do you receive
15  roughly per month?
16      A.  Almost $800 a month.
17      Q.  Okay.  Now, ma'am, you
18  indicated that when you came back from
19  your trip to the Chicago area to see
20  your son in August of 2007, you spoke
21  to this expert about a whole variety of
22  places that you had had troubles with,
23  right?
24      A.  Yes.
25      Q.  About how many?

40 (Pages 154 to 157)

Page 158

1    A.  I don't know exactly but I
2  know that Chicago was trying.  It was a
3  trying environment.
4    Q.  What I'm getting at, I
5  guess, is -- well, just forget that.
6    How many other lawsuits have you
7  filed that are based upon your visit to
8  the Chicago area in August 2007?
9    A.  I'm not sure.
10    Q.  Approximately?
11    A.  I can't tell you.  I don't
12  know.
13    Q.  You don't know how many
14  lawsuits you filed?
15    A.  No, I file a lot of
16  lawsuits, sir.
17    Q.  Is this more than 25?
18    A.  No, no, no.
19    Q.  Less than ten?
20    A.  In Chicago, less than ten.
21    Q.  Okay.  At the time you filed
22  this particular lawsuit that we're here
23  for today, at or about that same time
24  you filed about eight or nine others; is
25  that right?

Page 159

1    A.  Perhaps.
2    Q.  Well, is that your best
3  estimate?
4    A.  Yes.
5    Q.  And you filed them all in
6  federal court in Chicago in the Northern
7  District of Illinois?
8    A.  Correct.
9    Q.  Okay.  And they all have
10  essentially the identical allegations,
11  right?
12    A.  Pretty much.
13    Q.  Okay.  In terms of the
14  alleged violations, they all have
15  essentially the identical allegations,
16  right?
17    A.  Similar.
18    Q.  Okay.  And I'm trying to
19  understand if all these different places
20  had all sorts of different violations,
21  why are the allegations in the eight or
22  nine or ten lawsuits essentially
23  identical with regard to the alleged
24  problems at each site?
25    A.  Because the problems

Page 160

1  everywhere pretty much are the same.
2    Q.  Okay.  And I take it, it was
3  the same circumstances that lead you to
4  file those other eight or nine or ten
5  suits, in that Mr. Bacon sent you them
6  in the mail, you looked at them, and
7  then they were filed?
8    A.  Correct.
9    Q.  And you didn't make any
10  changes to them?
11    A.  Correct.
12    Q.  When did you start filing
13  lawsuits?
14    A.  Shortly after I became
15  involved with Disabled Patriots.
16    Q.  And of all the suits you've
17  filed, have they been in conjunction
18  with Disabled Patriots?
19    A.  Pretty much, yes.
20    Q.  And is it fair to say you
21  filed more than a hundred so far?
22    A.  I don't know if it's a
23  hundred.
24    Q.  What's your best estimate?
25    A.  I would certainly say

Page 161

1  somewhere between 70 and a hundred.
2    Q.  Have they all been filed in
3  federal courts around the country?
4    A.  In the Greater Cleveland
5  area, yes.
6    Q.  So before you filed this
7  batch of Chicago lawsuits in the fall of
8  2007, had your other 50 or 60 or 70
9  suits all been filed in the Cleveland
10  area?
11    A.  Yes.
12    Q.  What other geographic
13  locations have you filed lawsuits in?
14    A.  I went to New Jersey once
15  and so there's some cases that are
16  pending in New Jersey.
17    Q.  About how many?
18    A.  Three or four.
19    Q.  And they were also filed in
20  conjunction with Disabled Patriots?
21    A.  I believe so, yes.
22    Q.  Okay.  And where in New
23  Jersey were they filed in federal court?
24    A.  Newark.
25    Q.  Okay.  And some of them are

41 (Pages 158 to 161)

Page 162

1   still pending?
2        A. Yes.
3        Q. Okay. Has Mr. Bacon been
4   your attorney for all these cases?
5        A. I work with a number of
6   attorneys and I can't tell you right now
7   offhand --
8        Q. Okay.
9        A. -- who does what.
10       Q. So New Jersey, Cleveland, and
11  Chicago, those are the areas you can
12  recall that you filed these federal
13  lawsuits in?
14       A. Columbus, Ohio.
15       Q. Also in federal court?
16       A. Yes.
17       Q. Okay. And did you file a
18  whole bunch of them there?
19       A. Yes.
20       Q. About how many?
21       A. I can't tell you.
22       Q. Dozens?
23       A. I don't think dozens but
24  certainly --
25       Q. More than ten?

Page 163

1        A. Maybe not. Maybe around
2   ten, I don't know.
3        Q. Okay. Do you keep any
4   records of any list or anything like
5   that, that would identify all the
6   various cases, these 75 or so you filed
7   across the country?
8        A. No.
9        Q. And do you keep your
10  deposition transcripts or pleadings or
11  anything from these cases?
12       A. No, but I have tons of
13  paperwork to substantiate it all --
14       Q. I don't know what you mean,
15  Ma'am, you know, pleadings from the
16  case --
17       A. Yes.
18       Q. -- or do you --
19       A. Yes.
20       Q. -- just mean your own notes?
21       A. No, no, no. When I get any
22  kind of legal anything, it's all kept on
23  file.
24       Q. So you have -- for instance,
25  you have a copy of the suit you filed

Page 164

1   here, right?
2        A. Absolutely, I have copies of
3   complaints. I have copies of filed
4   suits. I have copies of outcomes of
5   everything.
6        Q. So if we asked you to
7   produce all your records about your
8   other lawsuits, you'd have a whole batch
9   of stuff you could produce?
10       A. Yes, I do.
11       Q. Okay. Other than having
12  this annual meeting, there's no
13  regularly scheduled meetings or anything
14  like, right?
15       A. No, but I'm in constant
16  contact with Maria Gallagher.
17       Q. Okay. Have you filed any
18  suits in state court?
19       A. I'm not in state court. I'm
20  not aware of having filed any in state
21  court.
22       Q. Have you been sued by
23  anybody?
24       A. In relation to what?
25       Q. Anything.

Page 165

1        A. I can't say that I've never
2   been sued. I might have been sued for
3   debt-related purposes.
4        Q. You've been sued by like a
5   collection type cases?
6        A. Yes.
7        Q. Okay. And how many times
8   have you been sued as a defendant?
9        A. I don't know.
10       Q. More than ten?
11       A. No.
12       Q. Less than ten?
13       A. Yes.
14       Q. More than five?
15       A. I don't know.
16       Q. Okay. And have those suits
17  all been filed in state court in the
18  Cleveland area?
19       A. I would imagine.
20       Q. And you have copies of some
21  of the pleadings and things from those
22  cases?
23       A. Maybe.
24       Q. Okay. They might be part of
25  the body of documents we talked about

42 (Pages 162 to 165)

Page 166

1  before?
2      A. Correct.
3      Q. And apart from -- and all
4  five of those or so, they were all
5  collection type matters?
6      A. Yes.
7      Q. Have you ever been sued as a
8  defendant in any other type of case?
9      A. I can't think what.
10     Q. Okay. And then have you
11 been -- other than the Disabled Patriots
12 type of cases we've talked about and the
13 collections cases, have you ever been a
14 party to or a witness in any other
15 types of cases that you can recall?
16     A. I have a personal injury
17 case pending right now.
18     Q. And where is that case
19 filed, ma'am?
20     A. Pennsylvania.
21     Q. In state court?
22     A. I don't know. It may -- the
23 truth is, it might not have even been
24 filed yet. We're --
25     Q. Who's your attorney?

Page 167

1      A. Lawrence Fuller.
2      Q. And what's the nature of
3  that matter, ma'am?
4      A. I was on a wheelchair lift
5  on a vacation last summer and the lift
6  broke and I was thrown 7 feet to the
7  ground.
8      Q. Who is the defendant or a
9  possible defendant?
10     A. Bus company.
11     Q. Bus company?
12     A. Yeah, it's --
13     Q. But you're not sure if they
14 filed it yet?
15     A. I'm not sure if it's been
16 filed yet.
17     Q. Okay. Any other cases
18 you've been involved in, either as a
19 party or a witness that we haven't
20 talked about so far, ma'am?
21     A. No.
22     MR. LEONARD: Okay. I don't
23 have any further questions for you right
24 now, ma'am. I certainly may issue a
25 document production request, based upon

Page 168

1  some of these documents you identified
2  for us but I don't have any questions
3  right now. Counsel?
4      THE WITNESS: Tom?
5      MR. LEONARD: Mr. Bacon?
6      MR. BACON: I apologize. I keep
7  this button on so if I start talking
8  and then realize no one's hearing me.
9  No, I have no questions at this time.
10     You want to just talk about
11 whether or not she wants to waive
12 or --
13     MR. LEONARD: Yeah. Ma'am, under
14 the rules, you're entitled to receive a
15 copy of this transcript and review it
16 for accuracy or to waive that right and
17 not receive that and to have what the
18 court reporter has typed as your
19 testimony.
20     What do you choose to do?
21     THE WITNESS: I'm fine either
22 way. I have confidence --
23     MR. LEONARD: Well, it's your
24 decision.
25     MR. BACON: We'd like to see it.

Page 169

1      THE WITNESS: Okay.
2      MR. LEONARD: All right. Ma'am,
3  thanks very much for your time and Miss
4  Court Reporter, what's regular delivery,
5  two weeks or so?
6      NOTARY PUBLIC: Yeah, ten days,
7  two weeks.
8      MR. LEONARD: Okay. Thanks a
9  lot everybody.
10     THE WITNESS: Thanks.
11     (Off the record at 4:35 p.m.)
12            - - - - -
13 .
14 .
15 .
16 .
17 .
18 .
19 .
20 .
21 .
22 .
23 .
24 .
25 .

43 (Pages 166 to 169)

Page 170

1  CEFARATTI GROUP FILE NO. 13289
2  CASE CAPTION: DISABLED PATRIOTS OF
3  AMERICA VS. TOWN & COUNTRY CHICAGO
4  DEPONENT: BONNIE KRAMER
5  DEPOSITION DATE: JANUARY 30, 2008
6
7          (SIGN HERE)
8  The State of Ohio,     )
9  County of Cuyahoga     )  SS:
10     Before me, a Notary Public in and
11  for said County and State, personally
12  appeared BONNIE KRAMER, who acknowledged
13  that he/she did read his/her transcript
14  in the above-captioned matter, listed
15  any necessary corrections on the
16  accompanying errata sheet, and did sign
17  the foregoing sworn statement and that
18  the same is his/her free act and deed.
19     IN TESTIMONY WHEREOF, I have
20  hereunto affixed my name and official
21  seal at          , this
22  day of          , A.D. 2008.
23  .
24
25  Notary Public          Commission Expires

Page 171

1          ERRATA SHEET
2  PAGE LINE CORRECTION AND REASON
3  .
4  .
5  .
6  .
7  .
8  .
9  .
10  .
11  .
12  .
13  .
14  .
15  .
16  .
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  .
25  .

Page 172

1          CERTIFICATE
2  .
3  State of Ohio     )   SS.:
4  County of Cuyahoga. )
5     I, Kathy Davian, a Notary Public
6  within and for the State of Ohio, duly
7  commissioned and qualified, do hereby
8  certify that the within named witness,
9  was duly sworn to testify the truth, the
10  whole truth and nothing but the truth in
11  the cause aforesaid; that the testimony
12  then given by the witness was by me
13  reduced to stenotypy in the presence of
14  said witness; afterwards transcribed,
15  and that the foregoing is a true and
16  correct transcription of the testimony
17  so given by the witness.
18     I do further certify that this
19  deposition was taken at the time and
20  place in the foregoing caption
21  specified.
22     I do further certify that I am
23  not a relative, counsel or attorney for
24  either party, or otherwise interested in
25  the event of this action.

Page 173

1     I am not, nor is the court
2  reporting firm with which I am
3  affiliated, under a contract as defined
4  in Civil Rule 28 (D).
5     IN WITNESS WHEREOF, I have
6  hereunto set my hand this     day of
7          , 2008.
8  .
9  .
10  .
11
12          Kathy Davian, Notary Public
13          within and for the State of Ohio
14  .
15  .
16  .
17  .
18  My commission expires August 12, 2012.
19  .
20  .
21  .
22  .
23  .
24  .
25  .

44 (Pages 170 to 173)